Anna Sortun
OSB No. 045279
Direct: 503-802-2107
Email: anna.sortun@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile: 503-274-8779

Cortney Robinson Henderson*
Pablo A. Moraga*
Steven Y. Bressler*
Robin Thurston*
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
Main: 202-448-9090
crhenderson@democracyforward.org

*Attorneys for Plaintiffs*
* Pro Hac Vice Forthcoming or Pending

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
### EUGENE DIVISION

| | |
|---|---|
| INSTITUTE FOR APPLIED ECOLOGY, 4950 S.W. Hout Street Corvallis, Oregon 97333-9598, <br><br> THE INSTITUTE FOR BIRD POPULATIONS, P.O. Box 518 Petaluma, California 94953, <br><br> and <br><br> MID KLAMATH WATERSHED COUNCIL, 38150 Highway 96 Orleans, California 95556, <br><br><div align="center">*Plaintiffs*,</div><br><div align="center">vs.</div> | Case No. 6:25-cv-02364 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

DOUG BURGUM, in his official capacity as
Secretary of the U.S. Department of the Interior,
1849 C Street, N.W.
Washington, D.C. 20240,

U.S. DEPARTMENT OF THE INTERIOR,
1849 C Street, N.W.
Washington, D.C. 20240,

BUREAU OF LAND MANAGEMENT,
1849 C Street, N.W.
Washington, D.C. 20240

NATIONAL PARK SERVICE,
1849 C Street, N.W.
Washington, D.C. 20240

U.S. FISH AND WILDLIFE SERVICE,
1849 C Street, N.W.
Washington, D.C. 20240,

and

U.S. GEOLOGICAL SURVEY,
12201 Sunrise Valley Drive
Reston, Virginia 20192,

*Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Institute for Applied Ecology ("IAE"), the Institute for Bird Populations
("IBP"), and the Mid Klamath Watershed Council ("MKWC") (collectively, "Plaintiffs")
bring this civil action against the United States Department of the Interior, Secretary of
the Interior Doug Burgum, in his official capacity, the Bureau of Land Management, the
National Park Service, the U.S. Fish and Wildlife Service, and the U.S. Geological
Survey (collectively, "Defendants") seeking a declaration vacating Defendants'
terminations of Plaintiffs' grants as violative of the First and Fifth Amendments to the
United States Constitution, and injunctive relief enjoining Defendants from effectuating

the violative terminations or further withholding federal funding on the basis of
Plaintiffs' protected speech and viewpoints, including their actual or perceived diversity,
equity, and inclusion ("DEI") values.

### Preliminary Statement

1.      For years, Plaintiff organizations have been faithful stewards of the
Department of the Interior's mission to protect and manage the Nation's natural resources
and cultural heritage. Yet beginning on September 23, 2025, the government suddenly
terminated Plaintiffs' grant agreements in retaliation for their unrelated speech and
without due process. Those terminations violated Plaintiffs' First and Fifth Amendment
rights; they are unconstitutional and unlawful.

2.      Plaintiffs are non-profit organizations that each carry out essential
environmental and conservation work throughout the western United States. For decades,
Plaintiff organizations applied for and were awarded federal grants from various Interior
bureaus, including the Bureau of Land Management, National Park Service, U.S. Fish
and Wildlife Service, and U.S. Geological Survey. Plaintiffs have been consistently
praised by Interior's bureaus for their work and have proven themselves to be trusted
caretakers of both the Nation's natural and financial resources. Nevertheless, Interior and
the defendant sub-agencies suddenly terminated approximately 79 of Plaintiffs' and other
organizations' grant agreements (cutting nearly $14 million in grant funding), without
warning or lawful rationale.

3.      The timing of these terminations was nonsensical. In the case of some
Plaintiffs' awards, Plaintiffs received termination notices just weeks after grantees'

funding had been renewed. In other cases, Interior cancelled awards that had already been terminated, or that the parties were in the process of closing out.

4.      In its termination notices, Interior pinned its decision to cancel Plaintiffs' grants on an unexplained misalignment between Plaintiffs' awards and agency priorities. The Defendants' public statements, however, tell a different story. On the same day the terminations were issued, Interior coordinated with the press to publicize the cancellation of grants awarded to organizations, like Plaintiffs, perceived to be espousing diversity, equity, and inclusion values (including land acknowledgment statements recognizing Indigenous peoples as the original inhabitants of specific lands). In posts on X and a Daily Caller publication, Interior and DOGE specifically pointed to Plaintiffs "proclaim[ing] diversity, equity and inclusion (DEI) values" as the justification for cancelling their grants, quoting verbatim a policy from IAE's website that the Administration dislikes. The targeted, disfavored speech is all outside the scope of Plaintiffs' work on the grants in question.

5.      Like the terminations overall, Interior executed its attack on grantees' speech carelessly. For example, at least one Plaintiff has no public DEI statement or policy or land acknowledgment, but the organization's use of words merely associated with DEI speech—like "diverse" —fell within the scope of Interior's targeted terminations.

6.      Interior's actions violate the First Amendment to the United States Constitution. Plaintiffs' statements on diversity, land acknowledgments, and use of certain words, are all protected speech. Defendants cannot discriminate against Plaintiffs' viewpoints because they differ from the Administration's stance on DEI or simply

incorporate language the Administration disfavors. This is particularly true where, as here, Plaintiffs' speech is unrelated to any grant program activities, which all focus on scientific research and ecological restoration and conservation. Nor can Defendants impose unconstitutional conditions on Plaintiffs' grant agreements or retaliate against grantees for their protected speech.

7.     Defendants also violated the Due Process Clause of the Fifth Amendment. Defendants' vague notices of termination provide Plaintiffs with no understanding of what speech, activity, or project Interior or its bureaus considers mis-aligned with its priorities. Without adequate explanation, virtually *any* public statement Plaintiffs make could be construed as supportive of DEI and out of step with the Administration.

8.     Plaintiffs have suffered and continue to endure significant and irreparable harm because of Interior's actions. Without funding, Plaintiffs' work is at a standstill. Plaintiffs have been forced to suspend programs and lay off employees. The terminations also impede Plaintiffs' organizational missions to study and preserve wildlife and the environment—indeed, the very wildlife and environment that Interior has been charged to protect. Plaintiffs also have been chilled in their speech: Some plaintiffs no longer consider it safe to make public statements or endorse viewpoints associated with DEI values without risking further grant terminations. Others have suffered reputational harm as they are unable to meet commitments made on the expectation that they would maintain grant funding if they continued their exemplary performance. Plaintiffs have also seen local and state funders, private investors and community partners shun Plaintiffs in their own attempt to avoid the Administration's retaliation. In that way, Interior has chilled the speech of not only Plaintiffs, but the larger public.

9.    Defendants' terminations of Plaintiffs' grants were unconstitutional. This Court should declare Defendants' actions void and, to prevent further harm, enjoin Defendants from effectuating or repeating their offenses.

## Parties

10.    The Institute of Applied Ecology ("IAE") is a 501(c)(3) organization located in Corvallis, Oregon and Santa Fe, New Mexico. The mission of IAE is to conserve native species and habitats through restoration, research, and education. IAE envisions a world where all people and wildlands are healthy and interact positively, biological diversity flourishes, and environmental challenges are met with a social commitment to solving problems with scientific principles.

11.    The Institute for Bird Populations ("IBP"), a California-based, 501(c)(3) nonprofit conservation science organization, was founded in 1989 to study the causes of bird declines. IBP's three organizational goals are to (1) conduct top-tier scientific research that answers pressing ecological and land management questions that support effective conservation of birds and other wildlife, (2) monitor the health of bird populations across their full annual cycle, yielding large data sets that are resources for conservation scientists worldwide, and (3) help train the next generation of avian conservationists.

12.    The Mid Klamath Watershed Council ("MKWC") is located in Orleans, California, and is a designated 501(c)(3) organization. MKWC collaboratively coordinates ecosystem restoration, promotes innovative policy and community vitality, and involves people in land stewardship. MKWC's work falls within four main areas: fisheries, fire & forestry, plants, and community & stewardship.

13.     Defendant U.S. Department of the Interior ("Interior" or "DOI") is a federal agency headquartered in Washington, D.C.

14.     Defendant Bureau of Land Management ("BLM") is a bureau of the U.S. Department of the Interior headquartered in Washington, D.C. with offices throughout the western United States and in Virginia and Alaska.

15.     Defendant National Park Service ("NPS") is a bureau of the U.S. Department of the Interior headquartered in Washington, D.C. with regional offices across the United States.

16.     Defendant U.S. Fish and Wildlife Service ("FWS") is a bureau of the U.S. Department of the Interior headquartered in Washington, D.C. with locations across the United States.

17.     Defendant U.S. Geological Survey ("USGS") is a bureau of the U.S. Department of the Interior headquartered in Reston, Virginia.

18.     Defendant Doug Burgum is Secretary of the Interior and is sued in his official capacity.

## Jurisdiction and Venue

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law.

20.     Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e), because at least one of the Plaintiffs is headquartered in Oregon and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here.

## Factual Allegations

**I.      Plaintiff Organizations Have Used Grant Awards Exclusively to Uphold the Department of Interior's Mission.**

21.     The American people, for generations, have entrusted Interior to protect and honor our Nation's natural resources and cultural heritage for the public benefit of all. From the Yosemite Half Dome to the Shenandoah Valley, the Alaskan taiga to the Sonoran Desert, the Department of the Interior has been tasked with the high duty of preserving the natural wonders and wildlife of the great American landscape. To that end, Interior has time and time again awarded grants[1] to organizations, like the Plaintiffs, dedicated to upholding this mission and ensuring its completion. Interior cannot accomplish its mission without external partners.

22.     Plaintiff IAE has worked with Interior for 25 years to restore and conserve native species. IAE has used Interior grants to support a variety of important conservation projects. For example, IAE is responsible for raising the extinction risk classification of the Fender's blue butterfly from "endangered" to "threatened" under the federal Endangered Species Act. This species of butterfly is endemic to the Willamette Valley of northwestern Oregon, where IAE is headquartered, and is the only butterfly in the United States to receive such a downlisting. IAE's work protecting the Fender's blue butterfly is aligned with Interior's goal of ensuring "[s]pecies and natural resources are protected" and Fish & Wildlife's statutory obligation to protect and restore endangered species.[2]

23.     Prior to September 23, 2025, IAE had 30 active grants agreements with Interior that funded habitat restoration, the protection of threatened, endangered, and at-

---

[1] Plaintiffs use the word "grants" here, and throughout this complaint, to refer to the various cooperative agreements, project grants, and awards issued to Plaintiffs by Interior's bureaus and subagencies and supervised by Defendants' respective grants management offices.
[2] U.S. Department of Interior, *Draft FY 2026–2030 Strategic Plan*, at 9, https://perma.cc/KSC6-G7CZ (last visited Dec. 18, 2025); *see also* 16 U.S.C § 1536.

risk species, wildfire and natural disaster recovery, and rural conservation strategy. The agreements were structured as multi-year cooperative partnerships, with annual funding provided by Interior's agencies upon request for budget modifications each year. IAE received seven newly modified grant awards from Interior in 2025, with three of them coming as recently as August 2025—less than 7 weeks before grants were terminated.

24.     Plaintiff IBP works to protect threatened bird populations through scientific research, monitoring, ecological data collection and advanced statistical analysis. In its history, IBP has been awarded over 150 grants from federal agencies based on its decades of experience, success, and tangible results in land management and avian conservation projects.

25.     IBP has committed federal grant funding exclusively to support bird monitoring across the United States, all in line with Interior's stated strategic goals. IBP's flagship program is the Monitoring Avian Productivity and Survivorship ("MAPS"), a continent-wide collaborative effort among public agencies, non-environmental groups, and individuals to assist the conservation of birds and their habitats through standardized bird monitoring.

26.     At the start of this year, IBP held 10 grants agreements from NPS and BLM. The agreements funded important conservation projects that included data collection and analysis to recommend methods of minimizing the impact of fires on birds within national parks, the monitoring of bird populations and the habitat needs of vulnerable bird species, and advising BLM's land management practices to reduce the agency's impact on pinyon-juniper sagebrush ecosystems. In July, IBP received an

extension on one of its grants based on IBP's effectiveness in achieving agency priorities, just two months before the grant was eventually terminated.

27.    Plaintiff MKWC has dedicated its organizational mission to advancing Interior's goals for ecosystem restoration and has two decades of federal partnership in its conservation and stewardship work throughout the Mid Klamath Watershed in Northern California.

28.    Using Interior grant funding, MKWC improved federally listed (threatened) coho salmon habitats in the Mid Klamath Region to significantly reverse their decline and foster salmon recovery in the Klamath River. MKWC has also used Interior grant funding to implement manual fuels reduction and prescribed fire treatments directly around communities threatened by catastrophic wildfires, resulting in fewer homes and lives being lost, in addition to restoring critical winter range habitats for wildlife such as deer and elk.

29.    At the beginning of this year, MKWC had been awarded 11 grants by FWS to address wildfire prevention, fishery management and monitoring, habitat restoration, and resource stewardship. Like IAE, MKWC's grants spanned multiple years and MKWC annually requests additional funding. As recently as September 2, 2025, MKWC received a new grant modification to fund work into the new year.

## II.    Defendants Terminated Plaintiffs' Grants with Interior because of Plaintiffs' Actual or Perceived Public Support of DEI Values

30.    On the morning of September 23, 2025, each Plaintiff received a media inquiry from the Daily Caller, asking Plaintiffs if their organization would like to comment on the DEI statements on their websites, and whether those statements were at odds with the Trump Administration's values as an awardee of federal grant funding.

31.     Throughout the same day, Plaintiffs began receiving notices of termination from Defendants cancelling their grants. Each notice stated that Plaintiffs' grant agreements had been terminated pursuant to 2 C.F.R. § 200.340 because they "no longer effectuate[d] the priorities" of the Interior subagencies that issued the awards.[3]

32.     Later that morning, Daily Caller published an article entitled "Trump Admin Axes Millions in Grants to Several DEI-Tied Environmental Organizations."[4] The article reported that "[t]he DOI cancelled numerous grant awards…with several groups that also happened to proclaim diversity, equity and inclusion (DEI) values, which Trump has regularly critiqued."[5] The article mentions Plaintiffs IBP and MKWC and specifically identified Plaintiff IAE as an organization who had made statements in support of DEI and whose grants were terminated. The article also quotes a statement from IAE's website: "diversity makes us strong and equality is in our nature. We are passionate about inclusion across gender, race, age, religion, identity, and experience."[6]

33.     That afternoon, Secretary Burgum posted a link to the Daily Caller article and announced via X that "[b]ecause of @DOGE's cost-cutting initiative, @Interior saved American taxpayers MILLIONS of dollars today by cutting nearly 80 grants for wasteful environmental groups. Real action = real savings."[7]

_____

[3] Plaintiff IBP's last Interior grant was terminated on November 19, 2025, via a similar notice. On information and belief, that grant was terminated for the same reasons as the grants terminated on September 23, 2025.
[4] Audrey Streb, *EXCLUSIVE: Trump Admin Axes Millions in Grants to Several DEI-Tied Environmental Organizations*, Daily Caller (Sep. 23, 2025), https://perma.cc/8F9A-8VEN.
[5] *Id.*
[6] *Id.*
[7] 1 Secretary Doug Burgum (@SecretaryBurgum), X (Sep. 23, 2025 at 4:12 PM), https://perma.cc/D2MV-FGKY.



34.    The next day, the Department of Government Efficiency ("DOGE")

reposted Secretary Burgum's September 23 post on X, adding that it was "[g]reat

working with @SecretaryBurgum and the @Interior team in terminating 79 wasteful

grants with savings of $14M" and that "[t]he grant recipient NGOs were not aligned with

agency priorities, using taxpayer dollars for 'recruiting, hiring, training and investing in

staff and the organization to increase engagement diversity, accessibility and inclusivity

across communities we live and work' and asserting that 'we are passionate about

inclusion across gender, race, age, religion, identity and experience'."[8]

---

[8] Department of Government Efficiency (@DOGE), X (Sep. 24, 2025 at 7:20 PM),
https://perma.cc/M5UK-9MVB.



35.     The DOGE post specifically referenced and quoted IAE's Diversity,
Equity, and Inclusion & Justice Action Plan ("DEIJ Action Plan"). This plan, which IAE
posted on its website in 2021, was created to support an initiative funded by a private
foundation.

36.     After receiving their notices, Plaintiffs reached out to Interior for an
explanation of its termination decisions, and to learn whether the decisions could be
appealed. They received replies stating (in one way or another) that Interior's decision to
terminate was not based on noncompliance, but rather a determination that the awards no
longer align with current program goals and agency priorities. Plaintiffs were also told
that there was no appeal process.

37.     Neither the termination notices nor Interior's later communications with
Plaintiffs explained what had changed in the agency's priorities or how Plaintiffs'
programs "no longer aligned" with program goals. Instead, Interior's public statements

reveal that it terminated Plaintiffs' grant awards based on the Plaintiffs' speech and presumed viewpoints on diversity, equity, and inclusion.

38.    On January 20, 2025, President Trump signed Executive Order 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing" which proclaims that "diversity, equity, inclusion, and accessibility (DEIA)" programs are "illegal and immoral discrimination programs." Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025). The Order directs "[e]ach agency, department, or commission head" to "terminate, to the maximum extent allowed by law, all … 'equity-related' grants or contracts." *Id.*

39.    Under Secretary Burgum and in line with the Order's directives, "[t]he DOI moved to cut 'DEI programs and gender ideology extremism.'"[9] But Plaintiffs' grants are not "DEI programs" and their DEI-related speech is separate from, not funded by, and unrelated to their work on grants from Defendants. Because Interior believed that each Plaintiff had "publicly endorsed DEI values in recent years," however, Defendants responded to that speech by terminating Plaintiffs' grants.[10] No other plausible explanation exists for the termination of Plaintiffs' awards, and none was provided.

40.    For example, Plaintiff IAE's DEIJ Action Plan, first published online in 2021, affirmed IAE's belief that "diversity makes us strong and equality is in our nature. We are passionate about inclusion across gender, race, age, religion, identity, and experience."[11] It was effectuated completely separately and apart from the government's

---

[9] Streb, *supra* note 4.  *Id.*
[10] *Id.*
[11] *About*, Institute for Applied Ecology, https://perma.cc/8766-3KBA (last visited Dec. 18, 2025).

grant-funded programs; all direct funding for the DEIJ Action Plan came from a private foundation. The private funding supported four primary goals to be completed by 2022, including (1) creating a DEIJ committee, (2) raising awareness, (3) creating community, and (4) reviewing HR policies and practices to support DEIJ. IAE completed its work on these goals on time in 2022, well before the September 2025 grant terminations. The DEIJ Action Plan also included two additional goals to guide continued efforts after 2022: (5) securing funding to support DEIJ work and (6) effectuating an office culture change. No direct funding from the government supported work on those goals.

41.     Plaintiff IBP has never published a DEI-related statement or policy, but the organization had a few job postings online that encourage people from all backgrounds to apply. Moreover, IBP frequently references the "diversity" of bird species in public statements and materials.

42.     Plaintiff MKWC's website formerly expressed support for the Indigenous groups whose ancestral lands are the focus of its work and referenced collaboration with diverse stakeholders. MKWC also has a Justice, Equity, Diversity and Inclusion Committee that serves their staff. Brief references to this committee were published in MKWC's 2020, 2021, and 2023 annual newsletters. This expression of support apparently led to this organization also getting caught up in the sweep of grant terminations.

43.     All Plaintiff organizations have dedicated grant funding towards the goals identified in the Interior's strategic planning.[12] They were performing their grant

---

[12] *Strategic Planning*, U.S. Dep't of Interior, https://perma.cc/C65M-L9AV (last visited Dec. 18, 2025).

PAGE 15 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

responsibilities well, and no direct costs of the grants went towards supporting so-called "DEI" initiatives. Instead, each plaintiff organization has used these funds to support Interior's work, in collaboration with the agency, its bureaus and its staff.

44.     Nevertheless, Interior stands by the rationale provided in the Secretary's and DOGE's social media statements for the grant cancellations. In response to a request for comment on another article reporting on the grant terminations in November 2025, an Interior spokesperson referred the media to the Secretary's September 23rd post.[13]

## III.  Defendants' Unlawful Termination of Plaintiffs' Grants Has and Will Continue to Irreparably Harm Plaintiffs.

45.     Plaintiff organizations have experienced and are continuing to experience significant harm to their First Amendment rights to free speech because of Defendants' grant terminations. Defendants' terminations and public statements have altered longstanding relationships with Interior, creating a new set of rules where the viewpoints espoused in a grant recipients' unrelated speech take precedence over the effectiveness of their work and alignment with Interior's purported strategic goals. Plaintiff organizations' speech has been chilled and will be further and irreparably chilled if Interior is permitted to continue punishing organizations that engage in government-disfavored speech. Plaintiff MKWC fears further grant terminations, while Plaintiffs IAE and IBP—which lost *all* of their Interior grants—fear that Defendants' actions will impact the organization's ability to seek new agreements with other federal agencies.

46.     Plaintiff organizations have also experienced and are continuing to experience harm to their financial and professional wellbeing. Because of Defendants'

---

[13] Cecilia Nowell, *After Trump cuts, seeds sit in the warehouse*, High Country News (Nov. 17, 2025), https://perma.cc/ZM5B-WEZQ.

mass cuts to grant funding, Plaintiffs have been forced to dramatically reduce their work forces. Plaintiffs' employees are career, highly experienced professionals with expertise and graduate degrees ranging from ornithology to phytology. These employees, and their highly specialized skills, are necessary for Plaintiff organizations to carry out their missions. Because of the grant terminations, Plaintiff organizations have had to reduce staff on several projects, reduce the scope of work on projects, or cancel them altogether.

47.     The speech-based grant terminations have also damaged, and threaten to further irreparably damage, Plaintiffs' reputations among community members and partners. Farmers that grew the seeds of endangered plant species, prison-work programs that partnered to help revitalize threatened insects, residents that were relying on critical fuels treatments to reduce the constant threat of wildlife, and dozens of other parties who have historically partnered with Plaintiff organizations can no longer rely on consistently funded partnerships and have now seen Plaintiffs roll back previous commitments due to the lost Interior funding.

48.     Finally, Defendants' prioritization of its efforts to penalize DEI-related speech over Interior's mission has harmed and will further irreparably harm ongoing projects meant to enhance and protect the environment. With the help of Interior grant funding, Plaintiff organizations have made significant strides to protecting and restoring American ecosystems that Interior was entrusted to safeguard. With funding now cut, endangered plants are left to wilt, and endangered animals are one step closer to extinction—outcomes contrary to the stated goals and missions of Plaintiff organizations, and Defendants' congressionally mandated duties. And because Plaintiffs' work is necessarily seasonal, some opportunities that are only present in the fall and winter after

the September grant terminations have been lost. Additional seasonal work planned for the upcoming spring will be irreparably lost absent relief, jeopardizing future harvests and restoration projects. Defendants' actions have thus damaged and will continue to further and irreparably damage Plaintiffs' organizational missions, including to help Interior conserve and restore the environment.

49.     This complaint provides a few examples of the extensive harms that Defendants' conduct has caused and will continue to irreparably cause Plaintiffs unless enjoined.

A.     *IAE Has Been Harmed and Will Continue to Be Irreparably Harmed.*

50.     After being publicly called out and punished by the Trump administration for its views on DEI, IAE has been fearful about how its public statements might trigger further terminations of federal agreements that still exist with non-Interior agencies. IAE is also seeking alternative funding through state-grants and private foundations, whose applications often explicitly require applicants to describe how their programs serve underserved populations or advance DEI. IAE fears further retaliation from the federal government based on the statements on diversity it might make in pursuit of alternative funding.

51.     Historically, agreements with the federal government accounted for 70–80% of IAE's annual budget, with Interior's agencies responsible for much of that funding. Defendants' terminations total more than $3,500,000 that was already obligated to IAE for conservation, and millions more that was expected to be awarded on these projects.

52.     These government grants supported 45 staff members, and dozens of seasonal employees spanning six states across the West. Since the September grant

terminations, IAE has had to reduce its workforce by approximately 40%. The scope and depth of IAE's work implementing their conservation mission have been significantly reduced due to the loss of these staff and agreements. As critical staff with specialized skills and experience have been laid off, several projects have hit standstills or have been cancelled altogether. This has contributed to an increased perception of IAE as being an unreliable employer, making permanent and seasonal positions more difficult to fill as dispirited staff members look for other employment.

53.    IAE's reputation with its partners has also been harmed. For example, IAE uses federal grant funding to pay small farmers for growing endangered plant species that would not otherwise be profitable to grow. These farmers entered these subcontracts with the understanding that the acres of their crop fields set aside to grow these endangered plants would be paid for by IAE using government grants' funding. Now, because of the terminations, IAE had to subsequently cancel these subcontracts and is unable to reimburse farmers for the space they set aside for these native plants, causing substantial financial loss. These farmers will likely be reluctant to enter similar arrangements with IAE in the future for fear of further losses. This has harmed IAE's reputation as an organization that can be trusted to supply stable funding and will further damage IAE's reputation absent relief from this Court.

54.    The reputational damage Defendants have caused IAE is translating to financial harm. IAE's donors and non-federal funders are now hesitant to fund IAE because they perceive it as less stable. Even academic association with IAE is seen as risky. Registrations are lower than usual for IAE's annual National Seed Conference, which typically has a large contingent of Interior employees in attendance. IAE is

concerned that as a result of the terminations, conference registration numbers may remain depressed because federal agency employees are wary of participating in IAE sponsored events. IAE has also learned that federal agency staff have either been instructed to cut ties with the organization or are nervous that supporting future partnerships with IAE will harm their careers.

55.    Defendants' actions, moreover, have and will continue to cause harm to several of IAE's conservation projects and its organizational mission of conservation and restoration of native species—harm that will become irreparable absent relief. One terminated grant, for example, was awarded to support IAE's conservation of the Fender's blue butterfly. After IAE dedicated years of Interior funding towards monitoring the butterflies and restoring its habitat in partnership with FWS, the Fender's blue butterfly became the only butterfly species in the United States to be downlisted from "endangered" to "threatened." IAE's partnership with Interiors' agencies has produced similar results for three plant species. With the termination of IAE's grants, however, the Fender's blue butterfly and the plant species now risk regressing from "threatened" back to "endangered."

56.    Other projects that have been halted include the recovery and preservation of Taylor's checkerspot butterfly, the lesser prairie-chicken, Chestnut-collared and Thick-billed longspurs, other migratory birds and elk, and the monarch butterfly. IAE projects aimed at supporting the recovery of habitats razed by wildfires have ended. The termination of these projects, among many others, will have a devastating effect on IAE's mission to use scientific principles to conserve native species and habitats absent judicial relief.

PAGE 20 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

B.    *IBP Has Been and Will Continue to Be Irreparably Harmed*.

57.    IBP's expressive activity is chilled by Defendants' grant terminations. As a result of the terminations, IBP has taken steps to ensure that the word "diversity"—even in the context of "avian diversity"—does not appear anywhere in its grant applications or website or other publications. Out of fear of further retaliation, IBP also removed certain job postings, which stated that IBP values diversity and encouraged applicants across all backgrounds, from its active website. IBP has been and continues to be chilled to the point of fearing even the *perception* of public alignment with DEI values.

58.    Interior's grant terminations amounted to $1 million, a third of IBP's overall funding stream. This has caused IBP to temporarily layoff one employee, and reduce hours for another 25% of their staff, all of whom have exemplary job performance records.

59.    Ten ongoing grants from IBP have been terminated by Interior, thus frustrating IBP's mission to protect and enhance American bird populations. These included long-term bird population monitoring in national parks across six states, scientific support of habitat management for bank swallows in the Alaskan Arctic, harnessing new technology to develop more efficient and cost-effective monitoring of federally threatened Gunnison Sage-Grouse in Colorado, a badly needed inventory of pinyon jay populations in national parks across much of the Southwest, and more.

C.    *MKWC Has Been and Will Continue to Be Irreparably Harmed*.

60.    MKWC was targeted for publishing a land acknowledgement on its website that commemorated the ancestral lands of the Karuk, Shasta, and Yurok people and espoused MKWC's commitment to support Indigenous groups. Interior terminated several grants to MKWC to punish it for its disfavored speech.

61.    In response, MKWC has and continues to engage in self-censorship and refrains from engaging in speech that the government disfavors. After its grants were terminated, MKWC removed their land acknowledgment from their website and has meticulously reviewed any reference to "equity", "diversity," and "inclusion" from public materials.

62.    As of December 2025, MKWC has lost $1.75 million in grant funding cuts. MKWC has been forced to cancel or modify approximately 11 current and planned contracts with contractors, tribal partners, and other NGOS. This threatens MKWC's partners' ability to sustain their business and project work. As one of the largest employers in the MKWC region, MKWC has concerns regarding job sustainability for their staff; this has dire economic impact for the community writ large.

63.    Several of MKWC's projects have been put on hold indefinitely or reduced in scope as a result of the grant terminations. These projects include wildfire prevention and fuel reduction, Chinook salmon monitoring, habitat restoration projects, and collaborative stewardship with local, Tribal, state, and federal partners. MKWC and its mission will continue to be harmed absent relief that will enable it to continue these projects.

64.    Like IAE, MKWC is also afraid that it will face further retaliation if it seeks alternative funding from state agencies and foundations whose grant applications ask applicants to describe how their work serves underserved populations or advances DEI.

## Claims for Relief

### Count One
### (Violation of First Amendment –Viewpoint Discrimination, Unconstitutional Conditions, & Retaliation)
### (All Defendants)

65.     The paragraphs above are incorporated and reasserted as if fully set forth here.

66.     The First Amendment to the United States Constitution protects the right to free speech and the expression of different viewpoints by prohibiting the government from "abridging the freedom of speech." U.S. Const. amend. I.

67.     The First Amendment prohibits the government from "regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* at 828.

68.     The First Amendment also prohibits the government from retaliating against or punishing protected speech and activity when a plaintiff has "(1) engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016).

69.     Additionally, the "unconstitutional conditions" doctrine prohibits the government from "requir[ing] a person to give up a constitutional right … in exchange for a discretionary benefit," *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994), or

denying "a benefit to a person on a basis that infringes [their] constitutionally protected interests—especially, [their] interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Resultingly, a funding condition is impermissible if it "unconstitutional[ly] burden[s] … First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("*AID*").

70.     Although the government may attach conditions to federal funding that "define the limits of the government spending program," the First Amendment prohibits conditions that restrict speech in ways that are "not relevant to the objectives of the program" or that otherwise "seek to … regulate speech outside the contours of the program itself." *AID*, 570 U.S. at 214–15. *See also Rust v. Sullivan*, 500 U.S. 173, 197 (1991) (government may not impose conditions restricting "protected [speech] outside the scope of the federally funded program").

71.     Nor may the Government use federal funding or benefits to "ai[m] at the suppression of dangerous ideas," *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998), to "drive certain ideas or viewpoints from the marketplace," *id.*, or to "burden the speech of others in order to tilt public debate in a preferred direction," *Sorrel v. IMS Health, Inc.*, 564 U.S. 552, 578–79. In short, "the government may not withhold benefits for a censorious purpose." *Koala v. Khosla*, 931 F.3d 887, 898 (9th Cir. 2019).

72.     Interior terminated Plaintiffs' grants based on the grantees' presumed DEI viewpoints, as those perspectives appeared in their publications and websites.

73.     Statements supporting diversity, equity and inclusions, or the use of words commonly associated with DEI-related initiatives, like "diverse" and "equity" are First Amendment-protected speech and advocacy that "convey the viewpoint that the

exclusion of historically disadvantaged groups is undesirable." *Thakur v. Trump*, 148 F.4th 1096, 1108 (9th Cir. 2025).

74.     The DEI-related speech targeted by Defendants is "not relevant to the objectives of the [grant] program," which aims to fund projects that improve wildlife habitat and conservation efforts. *AID*, 570 U.S. at 214. Nor is the targeted DEI speech funded by the grant awards, rather it falls "outside the contours of the program itself." *Id.* at 215.

75.     Moreover, the termination of Plaintiffs' grants was driven by a "censorious purpose." *Koala*, 931 F.3d at 898. Defendants intended to suppress DEI initiatives and policies—ideas that the Administration considers dangerous. Exec. Order No. 14151.

76.     Thus, Defendants' termination of Plaintiffs' grants violated the First Amendment by:

a.     discriminating against Plaintiffs' viewpoints on diversity;

b.     imposing an unconstitutional condition on Plaintiffs' federal funding, effectively conditioning Plaintiffs' funding on speech restrictions that discriminate against DEI viewpoints; and

c.     targeting for retaliation and suppression Plaintiffs' diversity and DEI-related speech and other forms of expression based on content and viewpoint, seeking to punish Plaintiffs engaging in speech disfavored by the federal government and proximately causing a chilling effect on the free speech of Plaintiffs and others who seek federally funded grant awards.

77.    Federal courts have the equitable power to enjoin unlawful actions by executive officials. *See, e.g., Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320, 326–27 (2015). This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

**Count Two**
**(Violation of Fifth Amendment – Due Process)**
**(All Defendants)**

78.    The paragraphs above are incorporated and reasserted as if fully set forth here.

79.    The Due Process Clause of the Fifth Amendment to the Constitution, U.S. Const. amend. V., prohibits government actions that fail to give fair notice of what conduct is forbidden or required. A government enactment is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited or is so indefinite as to allow arbitrary and discriminatory enforcement. *FCC v. Fox Television Stations, Inc.,* 567 U.S. 239, 253 (2012); *United States v. Williams*, 553 U.S. 285, 304 (2008).

80.    Defendants' actions alleged herein establish unconstitutionally vague standards for determining whether grant agreements will be terminated and do not tie the cancellation of grants to specific alleged acts or omissions, much less specific conduct reasonably related to the grant agreements at issue. Nor have Defendants provided any adequate notice to Plaintiffs regarding what conduct was forbidden or required to avoid such consequences.

81.    For example, Defendants' notices of termination leaves Plaintiffs unable to determine what kinds of public statements or language or other practices run afoul of

agencies' "priorities" and how Plaintiffs could possibly reconfigure organizational activities and programs to stay within the bounds of those priorities.

82.    Defendants' efforts to purge grantees with public DEI-related statements from their federally funded awards accordingly violate the Due Process Clause.

## Prayer for Relief

WHEREFORE, Plaintiffs pray that this Court:

A.    Declare as unlawful Defendants' notices of termination that terminated grants previously awarded to Plaintiffs as violative of the United Constitution's First and Fifth Amendment protections of free speech and due process;

B.    Preliminarily and permanently enjoin Defendants from giving effect to the violative terminations; to restore such previously awarded grant agreements; to require Defendants to provide no-cost extensions to grantees for the time necessary to resume and complete interrupted work; and to return to the lawful and orderly grant procedures they employed prior to September 23, 2025, with extensions for any passed deadlines and the suspension of any close-out procedures initiated by the violative terminations;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

C.      Preliminarily and permanently enjoin Defendants from refusing to grant,

non-renewing, withholding, freezing, suspending, terminating, conditioning, or otherwise

restricting use of federal funds to Plaintiffs, or threatening to do so, based on Plaintiffs'

actual or perceived statements regarding DEI; and

D.      Grant such other relief as the Court deems just and proper.


DATED:  December 18, 2025.                    Respectfully submitted,

_/s/ Anna Sortun_____
Anna Sortun, OSB No. 045279
Direct: 503-802-2107
Email: anna.sortun@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile: 503-274-8779

Cortney Robinson Henderson*
Pablo A. Moraga*
Steven Y. Bressler*
Robin Thurston*
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
Main: 202-448-9090
crhenderson@democracyforward.org

*Attorneys for Plaintiffs*
* Pro Hac Vice Forthcoming or Pending