Anna Sortun,
OSB No. 045279
Direct: 503-802-2107
Email: anna.sortun@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile: 503-274-8779

Cortney Robinson Henderson *(pro hac vice)*
Pablo A. Moraga*
Steven Y. Bressler *(pro hac vice)*
Robin Thurston*
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
Main: 202-448-9090
crhenderson@democracyforward.org

*Attorneys for Plaintiffs*
* Pro Hac Vice Forthcoming or Pending

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| INSTITUTE FOR APPLIED ECOLOGY *et al.*, | Case No. 6:25-cv-02364 |
| *Plaintiffs*, | |
| vs. | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM** |
| DOUG BURGUM *et al.*, | |
| *Defendants*. | Request for Oral Argument |

# TABLE OF CONTENTS

MOTION FOR PRELIMINARY INJUNCTION..........................................................................1

LR 7.1 CERTIFICATION..................................................................................................2

MEMORANDUM IN SUPPORT...........................................................................................2

    INTRODUCTION ........................................................................................................2

    BACKGROUND ..........................................................................................................4

    I.    Plaintiffs Have Been Faithful Stewards of the Department of Interior's Mission for Decades. ................................................................................................4

    II.   The President and his Administration Disfavor Diversity, Equity, and Inclusion Efforts..............................................................................................................7

    III.  Defendants Suddenly Terminated Plaintiffs' Grants. ...........................................8

        A.    Interior Targeted Plaintiffs' Awards for Termination Because of Plaintiffs' Actual or Perceived Support of DEI Values.......................................9

        B.    Plaintiffs' Did Not Use Any Direct Federal Funding to Support Diversity, Equity, and Inclusion Activities.............................................................11

        C.    The Terminations Have Chilled Plaintiffs' Freedom of Speech and Impacted Their Work and Interior's Mission ....................................................13

    STANDARD OF REVIEW............................................................................................14

    ARGUMENT.............................................................................................................14

    I.    Plaintiffs Are Likely to Succeed on Their First Amendment Claims Against Defendants ......................................................................................................14

        A.    Defendants unlawfully discriminated against Plaintiffs for their speech and viewpoints on diversity .............................................................................15

        B.    Defendants imposed unconstitutional conditions on Plaintiffs' grant awards...........................................................................................................20

        C.    Defendants retaliated against Plaintiffs' speech. ...............................................24

    II.   Plaintiffs are Suffering and Will Continue to Suffer Increasingly Irreparable Harm Absent Injunctive Relief........................................................................26

    III.  The Balance of the Equities and the Public Interest Weigh in Favor of an Injunction........................................................................................................29

    IV.  This Court Has Jurisdiction to Hear Plaintiffs' Claims and Authority to Order Requested Relief ..............................................................................................31

    V.    This Court Should Not Require Bond .................................................................32

    VI.  This Court Should Enjoin Defendants' Unlawful Terminations .............................33

    CONCLUSION...........................................................................................................34

## TABLE OF AUTHORITIES

**CASES**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013).......16, 21, 22, 23, 24

*All. for the Wild Rockies v. Pena*, 865 F.3d 1211 (9th Cir. 2017) ................................................14

*Am. Ass'n of Univ. Professors v. Trump*, No. 3:25-cv-07864,
2025 WL 3187762 (N.D. Cal. Nov. 14, 2025)................................................... 16, 17, 30

*Am. Council of Learned Soc'ys v. McDonald*, 792 F. Supp. 3d 448 (S.D.N.Y. 2025)...........17, 18

*Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184 (9th Cir. 2018) ...........................................18

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858 (9th Cir. 2016)..............................25

*Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320 (2015) .................................................31

*Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023)............................................................................30

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301 (1991) ................29

*Boos v. Barry*, 485 U.S. 312 (1988).........................................................................................17

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973)...........................................................................26

*Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011)...................................................................19

*Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625 (4th Cir. 2016)..............................................20

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61 (2022).........................18, 19

*Cmty. Legal Servs. in E. Palo Alto v. HHS*, 780 F. Supp. 3d 897 (N.D. Cal. 2025)....................33

*Cnty. of Santa Clara v. Noem*, No. 3:25-cv-08330, 2025 WL 3251660
(N.D. Cal. Nov. 21, 2025)...............................................................................................17

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
657 F.3d 936 (9th Cir. 2011).............................................................................................20

*Cottonwood Envt'l. L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015) .........................30

*Cuviello* v. *City of Vallejo,* 944 F.3d 816 (9th Cir. 2019).............................................................26

*Dep't of Educ. v. California*, 604 U.S. 650 (2025) .............................................................. 31, 32

*Dolan v. City of Tigard*, 512 U.S. 374 (1994) ........................................................................ 21

*Elrod* v. *Burns,* 427 U.S. 347 (1976) ........................................................................................ 26

*FCC v. League of Women Voters*, 468 U.S. 364 (1984) ...................................................... 18, 22

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664
    (9th Cir. 2023) .................................................................................................................. 14

*Heffernan v. City of Paterson*, 578 U.S. 266 (2016) ................................................................ 18

*IMDb.com Inc. v. Becerra*, 962 F.3d 1111 (9th Cir. 2020) ................................................ 19, 20

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) .............................................................. 33

*Junior Sports Mags. Inc. v. Bonta,* 80 F.4th 1109 (9th Cir. 2023) ........................................... 29

*Klein* v. *City of San Clemente,* 584 F.3d 1196 (9th Cir. 2009) ................................................. 26

*Koala v. Khosla*, 931 F.3d 887 (9th Cir. 2019) ......................................................... 17, 24, 25

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) .......................................................... 29

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ........................................................................................... 29

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ............................ 28, 30

*Legal Servs. Corp v. Velazquez*, 531 U.S. 533 (2001) .............................................................. 24

*Maryland v. Corp. for Nat'l and Cmty. Serv.*, 785 F. Supp. 3d 68 (D. Md. 2025)..................... 28

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)................................................................... 26

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243
    (D. Md. 2025)........................................................................................................... 16, 33

*Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100 (D.D.C. 2025).............................. 23

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ...................................... 15, 17, 24

*Nat'l Treasury Emps. Union v. Cornelius*, 617 F. Supp. 365 (D.D.C. 1985) ............................ 16

*Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61 (D.D.C. 2025)...................................................23

*Newsom v. Albermarle Cnty. Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003) .........................................26

*NIH v. Am. Public Health Ass'n*, 606 U.S. ----, 145 S. Ct. 2658 (2025) .....................................31

*Nken v. Holder*, 556 U.S. 418 (2009)..........................................................................................29

*Or. Council for Humans v. U.S. DOGE Serv.*, 794 F. Supp. 3d 840 (D. Or. 2025) ...............27, 33

*Packard Elevator v. ICC*, 782 F. 2d 112 (8th Cir. 1986) ............................................................27

*Pauma Band of Luiseno Mission Indians of Pauma & Yuima Rsrv. v. California*,
    813 F.3d 1155 (9th Cir. 2015)............................................................................................32

*People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*,
    766 F.2d 1319 (9th Cir. 1985).............................................................................................33

*Perry v. Sindermann*, 408 U.S. 593 (1972) ...............................................................................21

*President & Fellows of Harvard Coll. v. DHS*, 788 F. Supp. 3d 182 (D. Mass. 2025)................18

*President & Fellows of Harvard Coll. v. HHS*, 798 F. Supp. 3d 77 (D. Mass. 2025)............22, 31

*R.I. Coal. Against Domestic Violence v. Kennedy*, No. 1:25-cv-00342,
    2025 WL 2988705 (D.R.I. Oct. 23, 2025) ..........................................................................17

*R.I. Latino Arts v. Nat'l Endowment for the Arts*, No. 1:25-cv-00079,
    2025 WL 1009026 (D.R.I. Apr. 3, 2025) ............................................................................16

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ..............................................................30

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015)............................................................15, 19

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ...........................................................26, 30

*Rokster v. Goldberg,* 448 U.S. 1306 (1980)................................................................................29

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ............................14, 15

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996)............................28

*Rust v. Sullivan*, 500 U.S. 173 (1991) .................................................................... 16, 21, 23, 24

*S.F. A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184 (N.D. Cal. 2025) .....................................17

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521
(N.D. Cal. 2020)..................................................................................................24

*Sorrel v. IMS Health, Inc.*, 564 U.S. 552 (2011) ........................................................24

*Stephens v. United States,* 165 Fed. Cl. 341 (2023)...................................................31

*Thakur v. Trump*, 148 F.4th 1096 (9th Cir. 2025) .................................... 15, 24, 25, 32

*Thakur v. Trump*, 787 F. Supp. 3d 955 (N.D. Cal. 2025) ...........................................28

*Thakur v. Trump*, No. 3:25-cv-04737, 2025 WL 2696424 (N.D. Cal. Sep. 22, 2025)
................................................................................................... 15, 17, 24, 32

*United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000)..............................19, 20

*Valle Del Sol Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013) .......................................20

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) .....................................28

*Virginia v. Hicks*, 539 U.S. 113 (2003)......................................................................26

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ..................................................18

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) ..........................................26, 31

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
774 F. Supp. 3d 86 (D.D.C. 2025) ...............................................................18

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ....................................14, 29

## STATUTES, RULES, AND REGULATIONS

16 U.S.C. § 1531..........................................................................................................6

16 U.S.C. § 3773..........................................................................................................5

16 U.S.C. § 661............................................................................................................5

16 U.S.C. § 664............................................................................................................5

2 C.F.R. § 200.340 ............................................................................................ 16, 17, 23

2 C.F.R. § 200.414 ......................................................................................................22

2 C.F.R. part 200 app. VII(A)(1) ................................................................22

30 U.S.C. § 1732 ............................................................................................5

43 U.S.C. § 1457b ..........................................................................................5

43 U.S.C. § 1737 ............................................................................................5

43 U.S.C. § 36d ..............................................................................................5

54 U.S.C. § 100703 ........................................................................................5

Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ...................7, 8

Fed. R. Civ. P. 65 .....................................................................................14, 33

**MISCELLANEOUS**

*About Interior*, U.S. Department of the Interior, https://perma.cc/DG4X-M8R2. ........................4

*About Us*, National Park Service, https://perma.cc/3AEK-9DVP ................................4

*About Us*, U.S. Fish & Wildlife Service, https://perma.cc/3R3Q-PW5V ....................5

*About Us*, U.S. Geological Survey, https://perma.cc/N8JY-7RUS ...............................5

Audrey Streb, *EXCLUSIVE: Trump Admin Axes Millions in Grants to Several DEI-Tied Environmental Organizations*, Daily Caller (Sep. 23, 2025), https://perma.cc/8F9A-8VEN .................................................................9, 10

Cecilia Nowell, *After Trump cuts, seeds sit in the warehouse*, High Country News (Nov. 17, 2025), https://perma.cc/ZM5B-WEZQ ...........................................13

Dep't of Interior, S.O. 3416, Ending DEI Programs and Gender Ideology Extremism (Jan. 30, 2025), https://perma.cc/7F8W-VWTX................................................8

Department of Government Efficiency (@DOGE), X (Sep. 24, 2025 at 7:20 PM), https://perma.cc/M5UK-9MVB .....................................................................11

*Monitoring Avian Productivity and Survivorship of Birds of Conservation Concern at Bandelier and Mesa Verde*, National Park Service (last accessed Dec. 21, 2025), https://perma.cc/9NEK-RX2V ......................................................6

*Our Mission*, Bureau of Land Management, https://perma.cc/YT2N-5FSR ................4

Secretary Doug Burgum (@SecretaryBurgum), X (Sep. 23, 2025 at 4:12 PM),
        https://perma.cc/D2MV-FGKY ................................................................................... 10

U.S. Const. amend. I ................................................................................................................ 14

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND
        SUPPORTING MEMORANDUM

## MOTION FOR PRELIMINARY INJUNCTION

For the reasons provided in the supporting memorandum of law, accompanying declarations, and exhibits, and the Complaint in this action, Plaintiffs Institute for Applied Ecology, the Institute for Bird Populations and the Mid Klamath Watershed Council (collectively, "Plaintiffs") move for an order entering a preliminary injunction against the United States Department of the Interior, Secretary of the Interior Doug Burgum, in his official capacity, the Bureau of Land Management, the National Park Service, the U.S. Fish and Wildlife Service, and the U.S. Geological Survey (collectively, "Defendants") and request preliminary injunctive relief:

1.      Declaring Defendants' terminations of grants previously awarded to Plaintiffs as unlawful and violative of the First Amendment to the United States Constitution.

2.      Enjoining, pending further order of the Court, Defendants, their agents, and anyone acting at Defendants' direction from giving effect to the violative terminations; restoring such previously awarded grant agreements; and requiring Defendants to provide no-cost extensions to Plaintiffs for the time needed to resume and complete interrupted work and return to the lawful and orderly grant procedures used employed prior to September 23, 2025, with extensions for any passed deadlines and the suspension of any close-out procedures initiated by Defendants in connection with the violative terminations.

3.      Enjoining Defendants from refusing to grant, non-renewing, withholding, freezing, suspending, terminating, conditioning, or otherwise restricting use of federal funds to Plaintiffs, or threatening to do so, based on Plaintiffs' actual or perceived statements regarding DEI.

PAGE  - 1     PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND
              SUPPORTING MEMORANDUM

4.      Requiring Defendants to file, within one week of entry of an order and every month thereafter until resolution of the merits, a Status Report documenting the actions that they have taken to comply with the Court's order.

## LR 7.1 CERTIFICATION

Via telephone conference, Counsel for Plaintiffs conferred with counsel for Defendants at the United States Attorney's Office for the District of Oregon over this Motion but were unable to resolve the issues raised herein.

## MEMORANDUM IN SUPPORT

### INTRODUCTION

Freedom of speech is the first right protected by the Bill of Rights. It is fundamental to the functioning of our democracy that people can speak and express themselves, no matter their viewpoints, without threat of government persecution. The First Amendment to the United States Constitution ensures freedom for individuals and organizations alike. Its protections are not lost when an organization pursues or accepts some form of federal funding. And as a result, the government cannot use its power of the purse to silence or punish organizations who hold viewpoints the government dislikes.

Yet, Defendants have attempted just that. This September, the Department of the Interior ("Interior") cancelled nearly 80 grant agreements with environmental and conservation non-profits solely on the basis of their speech unrelated to any federally funding activity. With help from the Department of Government Efficiency ("DOGE"), Interior targeted grantees that it believed publicly supported diversity, equity, and inclusion ("DEI") values that the Administration disfavors, and terminated their awards without warning or explanation. Eager to send a message to the public, Interior coordinated with a favored media outlet to publicize the

terminations as an accomplishment in opposition to DEI. A news reporter contacted grantees *before* many of them had even received notices of termination asking for comments on their DEI values as recipients of federal grants. Interior later boasted of its "cost-saving" cuts on social media, but only pointed to the grantees' speech and viewpoints as justification for the terminations, not their performance.

Despite stellar track records and decades of partnership in support of Interior's mission to protect and steward our nation's wildlife and natural resources, the Institute for Applied Ecology ("IAE"), the Institute for Bird Populations ("IBP"), and Mid Klamath Watershed Council ("MKWC") (collectively, "Plaintiffs") were targeted by Interior for their perceived support of DEI. IAE's diversity, equity, inclusion and justice action plan, specifically the organization's equity-based work culture practices, were highlighted in the government's social media posts. But IAE's DEIJ initiatives are unrelated to its grant activities and were directly funded by a private foundation. Neither IBP nor MKWC have published DEI policies, but they were also targeted for their perceived support of DEI values; again, unrelated to their conservation efforts.

Plaintiffs received nearly identical notices of termination from Interior's Bureau of Land Management ("BLM"), National Park Service ("NPS"), U.S. Fish and Wildlife Service ("FWS"), and U.S. Geological Survey ("USGS") (collectively with Interior, "Defendants"). Each notice asserts that Plaintiffs' awards no longer align with agency priorities. Presidential administrations are free to pursue perspectives and policies that differ from their predecessors. But they may not violate the Constitution in pursuit of their agendas. A change in agency priorities is not an avenue for the suppression of free speech.

The terminations have harmed and will continue to harm Plaintiffs. Each organization fears that their online publications or statements may trigger additional grant terminations or

other retaliation from the government. Plaintiffs' ability to carry out their organizational missions has been compromised. Layoffs and staff reductions have forced Plaintiffs to reduce the scope of their programming, or halt projects all together. Plaintiffs' reputations have been damaged because they are no longer reliable sources of funding for their partners. Without preliminary relief, these harms will have irreparable consequences, not only for Plaintiffs, but also for the wildlife and natural resources each Plaintiff (and Interior) endeavors to protect.

Plaintiffs ask this Court to declare Defendants' termination notices unlawful and seek preliminary injunctive relief that would enjoin Defendants from effectuating the terminations.

## BACKGROUND

### I. Plaintiffs Have Been Faithful Stewards of the Department of the Interior's Mission for Decades.

For more than a century, the American people have entrusted Interior to tend to the American landscape, and all its natural beauty and splendor, from sea to shining sea. Interior has vowed to manage the Nation's natural resources and cultural heritage and provide scientific and other information about those resources.[1] Accordingly, each of Interior's operating units work in tandem to advance this mission. The Bureau of Land Management strives to "sustain the health, diversity, and productivity of public lands for the use and enjoyment of present and future generations."[2] The National Park Service looks after our nation's national parks, to preserve the "unimpaired access to their natural and cultural resources."[3] The Fish and Wildlife Service tends to the "conservation and management of fish, wildlife, plants and their habitat."[4] And, the U.S. Geological Survey provides "science about the natural hazards that threaten lives and

---

[1] *About Interior*, U.S. Department of the Interior, https://perma.cc/DG4X-M8R2.
[2] *Our Mission*, Bureau of Land Management, https://perma.cc/YT2N-5FSR.
[3] *About Us*, National Park Service, https://perma.cc/3AEK-9DVP.
[4] *About Us*, U.S. Fish & Wildlife Service, https://perma.cc/3R3Q-PW5V.

livelihoods, the water, energy, minerals, and other natural resources we rely on, the health of our ecosystems and environment, and the impacts of climate and land-use change."[5] Congress, recognizing that Interior could not achieve its myriad critical goals on its own, regularly empowers the agency's bureaus to cooperate with the American people to accomplish their duties.[6] Interior has time and time again partnered with organizations dedicated to advancing its mission, including each of the Plaintiffs.

Plaintiff IAE was founded in 1999 as a 501(c)(3) charitable organization to restore native species and save habitats through restoration, research, and education. Kaye Decl. ¶ 4. IAE has a team of experts across specialties—botanists, ecologists, educators, and restoration professionals—that work across communities in the American West. *Id.* ¶ 5. Interior has awarded IAE several hundred grants, which IAE has used to provide tangible results in land management and conservation. *Id.* ¶ 6; *see also id.* ¶ 22. These results include improving the extinction risk classification of Fender's blue butterfly from "endangered" to "threatened." *Id.* ¶ 7. This species is endemic to the Willamette Valley of northwestern Oregon, where IAE is headquartered, and is the only species of butterfly in the United States to be downlisted from "endangered" to "threatened." *Id.* Fender's blue butterfly conservation directly advances FWS's statutory obligation to protect and restore endangered species, and it is but one of IAE's many achievements in partnership with Interior.[7]

---

[5] *About Us*, U.S. Geological Survey, https://perma.cc/N8JY-7RUS.
[6] *See* 43 U.S.C. § 1737 (Secretary may enter into contracts and cooperative agreements for BLM); 30 U.S.C. § 1732 (same, between BLM and tribes); 54 U.S.C. § 100703 (same, between NPS and universities); 16 U.S.C. § 664 and 16 U.S.C. § 3773 (same, for FWS); 43 U.S.C. § 36d and 43 U.S.C. § 1457b (same, for USGS); 16 U.S.C. § 661 (Secretary authorized to provide financial assistance through FWS).
[7] 16 U.S.C. § 1531 ("It is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species.")

PAGE - 5    PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND
SUPPORTING MEMORANDUM

Plaintiff IBP was founded in 1989 as a 501(c)(3) charitable organization created to protect threatened bird populations. Siegel Decl. ¶ 4. IBP draws from a wealth of expertise in biology, ecology, natural history, and statistics, all dedicated to conservation and land management. *Id.* Over the years, IBP has received more than 150 grants from federal agencies, which it has used to make strides in bird monitoring and conservation. *Id.* ¶ 7; *see also id.* ¶ 26 (describing a relationship with Interior of "nearly 30 years"). For example, through one long term initiative—the Monitoring Avian Productivity Survivorship ("MAPS") program —IBP and Interior built a continent-wide collaborative effort between agencies and non-governmental organizations to aid in bird conservation by monitoring them and their habitats. *Id.* ¶ 5. With the help of Interior, IBP placed more than 1,200 MAPS stations in nearly every state, collecting more than 2.5 million bird capture records. *Id.*[8]

Plaintiff MKWC has operated since 2004 as a 501(c)(3) nonprofit organization dedicated to coordinating ecosystem restoration and promoting innovative policy throughout the Mid Klamath Watershed—the middle section of the vast Klamath River Basin in Northern California. Harling Decl. ¶ 4. MKWC's work focuses on the restoration of fisheries, watershed education, fire and fuels management, invasive species management, and more. *Id*. Since its inception, MKWC has worked well with the federal government, entering into cooperative agreements that deliver measurable outcomes in ecosystem restoration and land stewardship. *Id.* ¶ 5. As just one example, MKWC's federally funded wildfire resilience projects have strategically cleared potential fuel sources in fire-prone northern California, avoiding what could have been millions

---

[8] *See also Monitoring Avian Productivity and Survivorship of Birds of Conservation Concern at Bandelier and Mesa Verde*, National Park Service (last accessed Dec. 21, 2025), https://perma.cc/9NEK-RX2V.

of dollars in losses from large-scale wildfires. *Id.* ¶ 6. This goal is in line with Interior's Fiscal

Year 2022–2026 Strategic Plan, which includes carrying out "several wildland fire management

activities before, during, and after wildfire events to ensure the protection of life and property,

and to sustain and aid the recovery of ecosystems."[9]

Nearly all of Plaintiffs' grants are collaborative agreements, where the federal

government participates in a grantees' project as a shared enterprise, rather than just engaging in

unilateral oversight. In turn, Plaintiffs muster and contribute substantial resources, skills, and

expertise to work with Interior towards each project's stated goals. However, despite years of

collaborating with Interior, Plaintiffs' organizations had their cooperative agreements and grants

terminated for reasons completely unrelated to those projects or Plaintiffs' performance—the

government's animus toward their speech.

## II. The President and his Administration Disfavor Diversity, Equity, and Inclusion Efforts

Anti-DEI initiatives have been a focal point of the Trump administration since day one of

the President's second term, and his animus to DEI is well-known.[10] On January 20, 2025,

President Trump signed several DEI-related executive orders, including Executive Order 14151.

Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025). Titled "Ending Radical and Wasteful

Government DEI Programs and Preferencing," Exec. Order No. 14151 proclaims that "diversity,

equity, inclusion, and accessibility' (DEIA)" programs are "illegal and immoral discrimination

programs." *Id.* The order directs "[e]ach agency, department, or commission head" to "terminate,

to the maximum extent allowed by law, all DEI … 'equity-related' grants or contracts. *Id.*

---

[9] Dep't of the Interior, *U.S. Department of the Interior FY 2022-2026 Strategic Plan* at 31, https://perma.cc/LK3M-KJQQ (Strategic Objective 2.2).
[10] Ashifa Kassam, *What is DEI and why is Trump opposed to it?*, The Guardian (Jan. 24, 2025), https://perma.cc/8K49-XCM4.

Secretary Burgum broadly adopted the President's anti-DEI policies across the Department of the Interior. On January 30, 2025, Secretary Burgum issued a Secretary's Order entitled "Ending DEI Programs and Gender Ideology Extremism" to implement Executive Order 14151. *See* Dep't of Interior, S.O. 3416, Ending DEI Programs and Gender Ideology Extremism (Jan. 30, 2025), https://perma.cc/7F8W-VWTX. The Secretary's order provides, among other things, that "all 'equity action plans'; equity-related policies, actions, initiatives, grants and contracts… will be terminated." *Id.*

**III. Defendants Suddenly Terminated Plaintiffs' Grants.**

In September, Plaintiffs became the newest target of Interiors' anti-DEI agenda. On the morning of September 23, 2025, Plaintiffs each received an email from a reporter at the *Daily Caller*, a right-wing news and opinion website based in Washington, D.C. The reporter, Audrey Streb, contacted every Plaintiff with a simple question: whether they had any comment on their organization's diversity, equity, and inclusion ("DEI") values. Plaintiff organizations did not respond to what seemed like an out-of-the-blue inquiry. Harling ¶ 13, Siegel ¶ 17, Kaye ¶ 18. All emails were sent at around 8 a.m. Pacific time, either before or shortly after Plaintiffs received any communications from Defendants. Kaye Ex. C, Siegel Ex. F,  Harling Ex. D.

Approximately one hour later, each Plaintiff received notice that several of its grants were terminated. Siegel Ex. C., Harling Ex. E, Kaye Ex. D.[11] The notices were sent from the various Interior bureaus who originally granted and managed each of Plaintiffs' awards, including BLM, FWS, USGS, and NPS. Despite coming from different offices and relating to

---

[11] Plaintiff IBP's sole remaining Interior grant was terminated on November 19, 2025, via a similar notice. Based on Defendants' public statements and treatment of IBP's other grants, this final agreement was terminated for the same reasons as the grants terminated on September 23, 2025.

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

different programs, each notice was substantively identical. The notices inform Plaintiffs that

"[a]s authorized under 2 CFR § 200.340, 'Termination', a Federal award may be terminated by

Federal awarding agency or pass through-entity pursuant to the terms and conditions of the

Federal award, including, to the extent authorized by law, if any award no longer effectuates the

program goals or agency priorities." Siegel Ex. C., Harling Ex. E, Kaye Ex. D. The notices go on

to state that each "award no longer effectuates the priorities," without offering any further

explanation of what priorities those are. Siegel Ex. C., Harling Ex. E, Kaye Ex. D.

Defendants' termination notices were unexpected. All of Plaintiffs' grants supported

projects that were directly in line with Interior's statutory obligations or stated strategic

initiatives. Defendants had just renewed some of the terminated awards in August and early

September, affirming that the awards complied with Interiors' goals and objectives. Siegel ¶ 12,

Harling ¶ 12, Kaye ¶ 17. Conversely, at least one of the notices purported to terminate an award

that Interior had already cancelled. Kaye ¶ 19.

## A. Interior Targeted Plaintiffs' Awards for Termination Because of Plaintiffs' Actual or Perceived Support of DEI Values

Shortly after the termination notices were delivered, at 10:56 a.m., the *Daily Caller*

published an article, "Trump Admin Axes Millions in Grants to Several DEI-Tied Environmental

Organizations" (hereinafter "*Daily Caller* Article").[12] Ex. A. The article reported that "DOI

cancelled numerous grant awards on Tuesday with several groups that also happened to proclaim

diversity, equity and inclusion (DEI) values, which Trump has regularly critiqued." *Id.* The *Daily*

*Caller* mentioned each of the Plaintiffs by name, reporting how IAE "outlined a DEI action plan

in 2021, noting that the organization affirms that 'diversity makes us strong and equality is in our

---

[12] Audrey Streb, *EXCLUSIVE: Trump Admin Axes Millions in Grants to Several DEI-Tied Environmental Organizations*, Daily Caller (Sep. 23, 2025), https://perma.cc/8F9A-8VEN.

nature. We are passionate about inclusion across gender, race, age, religion, identity, and experience.'" *Id.* Streb further reported that the "[t]he agency also cut awards for a few other environmental groups including the Institute For Bird Populations [and] the Mid Klamath Watershed Council." *Id.*

The same afternoon, Secretary Burgum posted a link to the *Daily Caller* Article on his X account. The Secretary claimed that "[b]ecause of @DOGE's cost-cutting initiative, @Interior saved American taxpayers MILLIONS of dollars today by cutting nearly 80 grants for wasteful environmental groups. Real action = real savings."[13]



The next day, the Department of Government Efficiency ("DOGE") reposted Secretary Burgum's X post and added: "Great working with @SecretaryBurgum and the @Interior team in

---

[13] Secretary Doug Burgum (@SecretaryBurgum), X (Sep. 23, 2025 at 4:12 PM), https://perma.cc/D2MV-FGKY.

terminating 79 wasteful grants with savings of $14M" and that "[t]he grant recipient NGOs were not aligned with agency priorities, using taxpayer dollars for 'recruiting, hiring, training and investing in staff and the organization to increase engagement diversity, accessibility and inclusivity across communities we live and work' and asserting that 'we are passionate about inclusion across gender, race, age, religion, identity and experience'." The latter portion of DOGE's X post quoted, verbatim, IAE's online diversity statement.[14]



## B.    Plaintiffs' Did Not Use Any Direct Federal Funding to Support Diversity, Equity, and Inclusion Activities

Despite the implication of Defendant Burgum and DOGE's posts, however, no Plaintiff used federal funding to directly support any DEI-related statement or initiatives. IAE's diversity statement, which was quoted by both the Daily Caller Article and DOGE, was part of IAE's

---

[14] Department of Government Efficiency (@DOGE), X (Sep. 24, 2025 at 7:20 PM), https://perma.cc/M5UK-9MVB.

Diversity, Equity, and Inclusion & Justice Action Plan ("DEIJ Action Plan"). Kaye ¶ 27. This plan was funded by a private foundation. *Id.*

MKWC has never published a DEI-related statement. Harling ¶ 19. However, MKWC's only public references to diversity have been expressions of support for the Indigenous groups whose ancestral lands are the focus of its work. *Id.* This "land acknowledgment" statement on MKWC's website, which has since been taken down, was the only possible target for Defendants' DEI-related terminations of MKWC grants. *Id.* MKWC's land acknowledgment statement also did not rely on any direct funding from federal grants. *Id.* ¶ 21.

Finally, IBP has also never had a public diversity statement. Siegel ¶¶ 19-20. The only possible targets for Defendants' DEI animus directed towards IBP is the fact that IBP's grants contained the word "diversity" – *e.g.*, "avian diversity" and "biodiversity," and job postings that encouraged applicants from all backgrounds to apply. *Id*; *see also*, Siegel Ex. A, Award L23AC00124 (stating "high avian diversity") and Award L21AC10420 (stating "biodiversity").

Every Plaintiff responded to the termination notices asking for further clarification of Interior's "priorities." Siegel ¶ 14, Harling ¶ 15, Kaye ¶ 20. Plaintiff IAE further explained the ways their projects aligned with Interior's strategic goals for FY 2022-2026, and even the forthcoming FY 2026-2030 initiatives. Kaye Ex. E. All received similar responses that provided no specific or additional explanation of the terminations and informed Plaintiffs that no administrative appeal was available. Siegel Ex. D, Kaye Ex. E, Harling Ex. F. However, when journalists asked Interior for comment on the grant terminations, an Interior spokesperson referred them to the Secretary's September 23 post.[15] Still without any other explanation, IAE

---

[15] Cecilia Nowell, *After Trump cuts, seeds sit in the warehouse*, High Country News (Nov. 17, 2025), https://perma.cc/ZM5B-WEZQ.

later learned that funding from Defendant BLM that had supported a position at IAE was shifted to fund an identical position at another organization. Kaye ¶ 23. The only specific explanation Plaintiffs have received for the terminations came from the *Daily Caller*, DOGE, and the Secretary, and all point to Plaintiffs' perceived or actual DEI-related speech.

### C. The Terminations Have Chilled Plaintiffs' Freedom of Speech and Impacted Their Work and Interior's Mission

All Plaintiffs have considered and have taken action to adjust their speech to be more palpable to the Trump Administration. Plaintiff MKWC removed their land acknowledgment from their website. Harling ¶ 29. Plaintiff IBP has internally discussed how to encourage diverse future job applicants, as well as how to refer to the diversity of bird species, moving forward. Siegel ¶ 31. Plaintiff IAE seriously considered removing the DEIJ Statement and DEIJ Action Plan from their website. Kaye ¶¶ 42-43. Further, because state grants and private foundations often require Plaintiffs to discuss how their organizations serve underserved populations or advances DEI, Plaintiffs are concerned about their ability to secure alternative funding without impacting their remaining federal grants. *Id.* ¶ 44; Harling ¶ 31.

The grant terminations have caused Plaintiffs to reduce their work and lay off staff. Before September 23, IAE's staff counted forty-eight regular employees; that is now down to twenty-nine. Kaye ¶ 31. IAE has also had to let go of additional, highly experienced seasonal workers and disrupt or indefinitely pause many projects. *Id.* ¶¶ 32-33. MKWC, too, was forced to drastically reduce the scope of its federally funded projects, forcing immediate changes on the ground and increased overtime work for its staff. Harling ¶¶ 22, 27. IBP reduced hours for six skilled-staff members, laid off one full-time scientist, and has now been precluded from hiring twelve seasonal employees. Siegel ¶¶ 24-25.

Community partners that have depended on Plaintiffs' relationships with Interior have questioned Plaintiffs' future. *See* Kaye ¶¶ 13, 35-38, Siegel ¶ 26, Harling ¶ 25. Because many of Plaintiffs' projects are inherently seasonal, opportunities that are only present this coming spring will be forever lost absent a return to the pre-termination status quo. Kaye ¶ 41.

## STANDARD OF REVIEW

To establish it is entitled to a preliminary injunction, the moving party must show (1) that it is likely to succeed on the merits; (2) irreparable harm is likely without preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. Fed. R. Civ. P. 65(b)(1), (c); *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). Alternatively, if there are "serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiffs favor, and the other two *Winter* factors are satisfied." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (cleaned up). "In a First Amendment case[,] ... the party seeking [an] injunction need only demonstrate the existence of a colorable First Amendment claim." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 694-95 (9th Cir. 2023) (cleaned up).

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on Their First Amendment Claims Against Defendants

The First Amendment protects the right to free speech and the expression of different viewpoints.  U.S. Const. amend. I. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of Univ. of Va*., 515 U.S. 819, 828 (1995). The government has "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert,*

*Ariz.*, 576 U.S. 155, 168 (2015) (cleaned up). Doing so is a "blatant" and "egregious" violation of the First Amendment. *Id.* at 163.

Statements expressing viewpoints on diversity, equity and inclusion are First Amendment-protected speech and advocacy that "convey the viewpoint that the exclusion of historically disadvantaged groups is undesirable." *Thakur v. Trump*, 148 F.4th 1096, 1108 (9th Cir. 2025) ("*Thakur II*"); *see also Thakur v. Trump*, No. 3:25-cv-04737, 2025 WL 2696424, at *13 (N.D. Cal. Sep. 22, 2025) ("*Thakur I*") (plaintiffs were likely to succeed in viewpoint discrimination claims where agency penalized DEI views). Defendants' termination of Plaintiffs' grants based on their actual and perceived viewpoints on diversity was an egregious and blatant violation of Plaintiffs' First Amendment rights. Specifically, in terminating Plaintiffs' grants, Defendants' unlawfully (1) regulated Plaintiffs' speech through viewpoint and content discrimination, (2) conditioned Plaintiffs' funding based on those viewpoints, and (3) retaliated against Plaintiffs for their speech by cancelling their federal funding.

### A. Defendants unlawfully discriminated against Plaintiffs for their speech and viewpoints on diversity

The First Amendment prohibits the government from "regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. Such government action "is presumed to be unconstitutional," *id.* at 828, even when the speaker is a recipient of federal funding. The government cannot "'leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints' or 'aim at the suppression of dangerous ideas.'" *Thakur II*, 148 F.4th at 1108 (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998)). The government is also prohibited, under threat of loss of funding, from excluding specific speech from public discourse, no matter how strongly the government disfavors the viewpoint or the content.

Defendants also cannot use 2 C.F.R. § 200.340 as carte blanche to violate the Constitution. Section 200.340 —which the government evokes in each termination notice— allows for the termination of grant agreements when they "no longer effectuate agency priorities." But it is axiomatic that "nothing permits an agency to 'regulate away' [] statutory commands," let alone constitutional provisions like the First Amendment. *Am. Ass'n of Univ. Professors v. Trump*, No. 3:25-cv-07864, 2025 WL 3187762, at *28 (N.D. Cal. Nov. 14, 2025) (quoting *Nat'l Treasury Emps. Union v. Cornelius*, 617 F. Supp. 365, 371 (D.D.C. 1985)). And "[a]s the Supreme Court has held in both *Rust* and *AID*, the Executive's authority to fund its policy priorities is still subject to the First Amendment, particularly where it seeks to encroach on protected speech made outside the scope of the federal funding" as Defendants do here. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 283 (D. Md. 2025), *opinion clarified*, 769 F. Supp. 3d 465 (D. Md. 2025) (citing *Rust v. Sullivan*, 500 U.S. 173 (1991) and *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc. ("AID")*, 570 U.S. 205 (2013)). As explained above, Plaintiffs' grants did not directly fund any DEI activities, including IAE's DEIJ Action Plan. *See supra* at 11-12. Defendants therefore violated Plaintiffs' First Amendment rights by using their Section 200.340 authority to terminate Plaintiffs' grant agreements to specifically and plainly discriminate against Plaintiffs' DEI viewpoints and the diversity-related content of their speech.

> ### 1.   *Defendants' terminations were viewpoint discrimination*

Defendants may not reject "a whole class of [grant] projects" based on "viewpoint alone," or use federal funding to "impose a disproportionate burden calculated to drive certain ideas or viewpoints from the marketplace." *R.I. Latino Arts v. Nat'l Endowment for the Arts*, No. 1:25-cv-00079, 2025 WL 1009026, at *12 (D.R.I. Apr. 3, 2025) (quoting *Finley*, 524 U.S. at 587); *Am. Council of Learned Soc'ys v. McDonald*, 792 F. Supp. 3d 448, 485 (S.D.N.Y. 2025) (granting preliminary injunction where "Defendants terminated [] grants based on . . . viewpoint,

in an effort to drive such views out of the marketplace"); *Koala v. Khosla*, 931 F.3d 887, 898 (9th Cir. 2019) (similar); *Thakur I*, 2025 WL 2696424, at *13 (similar); *Cnty. of Santa Clara v. Noem*, No. 3:25-cv-08330, 2025 WL 3251660, at *37 (N.D. Cal. Nov. 21, 2025) (similar); *R.I. Coal. Against Domestic Violence v. Kennedy*, No. 1:25-cv-00342, 2025 WL 2988705, at *8 (D.R.I. Oct. 23, 2025) (similar); *S.F. A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1217 (N.D. Cal. 2025) (similar). Yet that is exactly what Defendants have done. Defendants cancelled Plaintiffs' grant agreements, without notice or explanation, on the same day that Interior told the world it had worked with DOGE to identify and cancel Plaintiffs' grants because Plaintiffs support DEI values. *Supra* at 9-12. When asked, Defendants offered no other explanation for the terminations, other than to rely on Section 200.340 and hide behind an alleged misalignment with unidentified agency priorities. *Supra* at 12.

This all supports the obvious inference that Plaintiffs' grants were terminated based on Plaintiffs' speech and viewpoints on DEI. No other plausible justification for the terminations exists, and none was provided. *See Am. Ass'n of Univ. Professors v. Trump*, 2025 WL 3187762, at *23 (finding a First Amendment violation when the government did not "attempt to identify any [goals or priorities]" under Section 200.340). The terminations, in turn, created an environment where "[o]ne category of speech has been completely prohibited . . . [while o]ther categories of speech . . . are permitted." *Boos v. Barry*, 485 U.S. 312, 319 (1988). Based on Defendants' public statements and the termination of Plaintiffs' grants, any speech or association related to diversity could be viewed as banned by the government if you are the recipient of federal funding.

It is of no moment that neither IBP nor MKWC have public DEI policies—the government's illicit motive establishes their First Amendment injury. *See Heffernan v. City of Paterson*, 578 U.S. 266 (2016) (holding that the government's partisan reason for firing an employee, even though mistaken, is decisive grounds for a First Amendment-based 1983 claim).

It is enough that Defendants perceived IBP and MKWC's viewpoints on diversity to be unaligned with the Administration and Defendants targeted and punished both grantees on the basis of that perception. *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 774 F. Supp. 3d 86, 88 (D.D.C. 2025) (First Amendment's prohibition against government subjecting individuals to retaliation after engaging in protected speech "includes retaliatory actions based on perceived viewpoint"); *Am. Council of Learned Soc'ys*, 792 F. Supp. 3d. at 485-493 (same); *President & Fellows of Harvard Coll. v. DHS*, 788 F. Supp. 3d 182, 207 (D. Mass. 2025) (same).

### 2. *Defendants' terminations were content-based discrimination*

Even if the termination of Plaintiffs' grants was somehow viewpoint-neutral (it was not), Defendants also impermissibly restricted Plaintiffs' right to speak based on the content of their speech.

A regulation or government restriction is content-based "when the purpose and justification for the law are content based," *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1204 (9th Cir. 2018) (citation omitted), "single[s] out specific subject matter for differential treatment," *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022), or when "enforcement authorities must necessarily examine the content of the message" to determine compliance. *FCC v. League of Women Voters*, 468 U.S. 364, 383 (1984) (citation omitted). Government action will only be deemed content neutral when it is "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Defendants' terminations impose content-based restrictions on Plaintiffs' speech. Through the *Daily Caller* article, the Secretary's social media post, and the DOGE post,

Defendants justify targeting Plaintiffs' grants for termination based on their DEI-related speech. The terminations' "underlying purpose . . . [wa]s to suppress particular ideas," and the terminations, in conjunction with the government's social media posts, distinguish permissible from impermissible speech "based on 'the topic discussed or idea or message expressed.'" *City of Austin*, 596 U.S. at 74 (2022) (quoting *Reed*, 576 U.S. at 171).

### 3. *Defendants' terminations fail to survive strict scrutiny*

Both viewpoint and content-based restrictions are presumptively unconstitutional. *Reed*, 576 U.S. at 163; *see also United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 818 (2000) ("It is rare that a regulation restricting speech because of its content will ever be permissible."). To defeat that presumption, the government must survive strict scrutiny and "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* This is a "demanding standard," *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011), and "[i]t is rare that a regulation restricting speech because of its content will ever be permissible," *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1125 (9th Cir. 2020) (quoting *Playboy Ent. Grp.,* 529 U.S. at 818).

No compelling government interest justifies the termination of Plaintiffs' grants. To prove that a restriction furthers a compelling interest, Defendants must present evidence—"more than anecdote and supposition"—of "an actual problem." *Playboy Ent. Grp.,* 529 U.S. at 822. Though DOGE and Interior claim that Plaintiffs are "wasteful environmental groups" there is no evidence that Plaintiffs have wasted or abused their federal awards. On the contrary, Plaintiffs have an extensive track record as responsible trustees of government funding. *Supra* at 5-7. And Defendants confirmed that Plaintiffs' grants were not cancelled due to noncompliance. *Supra* at Kaye ¶ 20, Harling ¶ 15, Siegel ¶14. At any rate, prohibiting speech that occurs *outside* the scope

of Plaintiffs' grant programs does nothing to further the government's interest in ensuring that the funds are spent well *within* the scope of their grant programs.

Interior's decision to terminate Plaintiffs' grants was also not narrowly tailored. When the government "has various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech, it fails to show that the law is the least restrictive means to protect its compelling interest." *IMDb.com*, 962 F.3d at 1126 (quoting *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011)). In other words, a restriction on speech is not narrowly tailored "[i]f a less restrictive alternative would serve the Government's purpose." *Playboy Ent. Grp.*, 529 U.S. at 813. To satisfy this inquiry, the regulation must be neither "overinclusive" nor "underinclusive." *Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016); *see also Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 825 (9th Cir. 2013). "[B]ecause restricting speech should be the government's tool of last resort, the availability of obvious less-restrictive alternatives renders a speech restriction overinclusive." *Valle Del Sol*, 709 F.3d at 826 (citation omitted).

Defendants were overinclusive in their attempt to eliminate awards "not aligned with agency priorities." *Supra* at 10. In fact, Defendants' terminations were so overinclusive that organizations without explicit and published DEI policies—like Plaintiffs MKWC and IBP— were targeted for grant terminations based on their use of words merely *associated* with diversity.

**B.    Defendants imposed unconstitutional conditions on Plaintiffs' grant awards**

Defendants' grant terminations did more than cut off Plaintiffs' federal funding—they, along with Interiors' public statements, sent an explicit message to Plaintiffs and other federal grantees: if you want to keep any of your grant awards you cannot make any statements that this

Administration believes to be supportive of DEI. Defendants, in essence, created an additional requirement to maintain grant funding that premises Plaintiffs' awards on their willingness to silence themselves. This is unlawful. The "unconstitutional conditions" doctrine prohibits the government from "requir[ing] a person to give up a constitutional right," like Plaintiffs' First Amendment right to free speech and expression, "in exchange for a discretionary benefit," *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994), or denying "a benefit to a person on a basis that infringes [their] constitutionally protected interests—especially, [their] interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Accordingly, a funding condition is impermissible if it "unconstitutional[ly] burden[s] . . . First Amendment rights." *AID*, 570 U.S. at 214.

While the government may attach conditions to federal funding that "define the limits of the government spending program," the First Amendment does not permit Defendants to create conditions that restrict speech in ways "not relevant to the objectives of the program" or that otherwise "seek to regulate speech outside the contours of the program itself." *Id.* at 214–15. *See also Rust*, 500 U.S. at 197 (government may not impose conditions restricting "protected [speech] outside the scope of the federally funded program"). Plaintiffs' viewpoints on diversity are obviously beyond the bounds of their grant programs, and irrelevant to the objectives of their awards. IAE's Diversity Equity Inclusion and Justice Action Plan, which focuses on accelerating racial, social and economic justice for Oregon's land and communities, Kaye ¶ 27, was funded by a non-federal donor, and operates separately from IAE's grant funded conservation, habitat support, and recovery programs with Interior. IBP's website and publications do not reference DEI work at all. Siegel ¶¶ 19-21. And even if they did, IBP's views on DEI are unrelated to the studies of vulnerable bird species, bird monitoring, and other work that IBP supports through its

grant projects with NPS and BLM. Siegel ¶¶ 9-12. Likewise, whatever resources MKWC used to

post their land acknowledgment did not directly derive from federal grants and is otherwise

unrelated to their work in conserving and restoring the Klamath watershed. Harling ¶ 21. *See*

*also President & Fellows of Harvard Coll. v. HHS*, 798 F. Supp. 3d 77, 136 (D. Mass. 2025)

(noting that there was "little connection between the research affected by the grant terminations

and antisemitism," and that "a review of the administrative record makes it difficult to conclude

anything other than that Defendants used antisemitism as a smokescreen for a targeted,

ideologically-motivated assault on this country's premier universities, and did so in a way that

runs afoul of the … First Amendment.").[16]

There simply can be no argument (and certainly no facts to suggest) that Defendants'

conditions here merely "define the limits of the government spending program" by "specify[ing]

the activities [the government] wants to subsidize." *AID,* 570 U.S. at 214-15. Defendants' vague

assertion that Plaintiffs' awards no longer align with agency priorities at best attempts to "recast

a condition on funding as a mere definition of its program," which courts do not allow, "lest the

---

[16] As noted, each of the terminated grants directly funded projects that were wholly unrelated to
Plaintiffs' DEI-related speech. Each grant also funded certain "indirect costs" "incurred for
common or joint purposes," 2 C.F.R. part 200 app. VII(A)(1), like "operations" and "general
administration" expenses. 2 C.F.R. § 200.414. While theoretically those costs could indirectly
support Plaintiffs' DEI-related speech, the general nature of these expenses, which are funded by
both private donors and the federal grants alike, makes it impossible for Plaintiffs to definitively
determine whether such funds supported any DEI-related speech. In such circumstances—*i.e.*,
when federal funding does not create a mechanism that allows the grantee "to segregate its
activities according to the source of its funding"—the Supreme Court has held that the
government may not impose speech restrictions on the totality of the grantee's activities,
including activities that are privately funded. *FCC*, 468 U.S. at 399-401. The "indirect costs"
funded by Plaintiffs' grants thus do not justify the unconstitutional conditions imposed by
Defendants here. To hold otherwise would allow the government to unconstitutionally "leverage
funding to regulate [Plaintiffs'] speech outside the scope of the program." *AID*, 570 U.S. at 216
(citing *FCC*, 468 U.S. at 399).

PAGE - 22    PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND
SUPPORTING MEMORANDUM

First Amendment be reduced to a simple semantic exercise.'" *Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 128 (D.D.C. 2025) (citing *AID*, 570 U.S. at 215) (finding likelihood of success on the merits of First Amendment claim because, inter alia, "[b]y appearing to target specific recipients because they associate with certain ideas, [the federal government] may be crossing a constitutional line"). Defendants are also not imposing restrictions on the uses of federal funding—again, Plaintiffs did not use federal funding towards any direct cost of their DEI-related speech or activities—or even solely on the operations of programs that the federal government funds. Rather, Defendants seek to "leverage funding" to regulate speech unrelated to Plaintiffs' grants, and "outside the contours" of any discrete federal program. *AID,* 570 U.S. at 214-15. They terminated federal grants, raising the prospect of terminating other federal funds, to punish or silence Plaintiffs and others who pronounce support for DEI.

Plaintiffs do not argue that Section 200.340, own its on, runs afoul of the First Amendment, as it does not facially "restrict speech outside the scope of the federal funds or contracts." *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 99 (D.D.C. 2025) (quoting *AID*, 570 U.S. at 217). Said another way, because Section 200.340 does "not 'effectively prohibit[]' or otherwise restrict 'the recipient from engaging in the protected conduct outside the scope of the federal[] fund[s],' [it] does not 'place[]' a constitutionally problematic 'condition on the *recipient* of the subsidy.'" *Id.* (quoting *Rust*, 500 U.S. at 197) (emphasis in original). Here, it is Defendants' *application* of Section 200.340 that violates the First Amendment. The District Court for the District of Columbia provides a helpful illustration:

> Consider an entity that receives four federal grants. It uses one to fund a program advancing the idea that transgender women should be able to participate in women's sports. The other three grants, though, support projects far afield from transgender rights or gender ideology more generally. Directed to 'end the Federal funding of gender ideology' as 'permitted by law' and ensure that such funds do not 'promote

gender ideology,' an agency would presumably terminate the first grant or tell the recipient that it will do so unless the recipient stops using the funds for that purpose…. But because the other grants are not advancing gender ideology in any way, the gender-ideology provisions are no basis—at least in most of their applications—to cut those grants.

*Id.* The same "bedrock principle" applies here. The government cannot (as Defendants have done) "leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints," *Thakur I*, 2025 WL 2696424, at *1 (citing *Thakur II*, 148 F.4th at 1108), or use federal funding to "aim at the suppression of dangerous ideas," *Finley*, 524 U.S. at 587, to "drive certain ideas or viewpoints from the marketplace," *id.*, or to "burden the speech of others in order to tilt public debate in a preferred direction," *Sorrel v. IMS Health, Inc.*, 564 U.S. 552, 578-79 (2011). In short, "the government may not withhold benefits for a censorious purpose." *Koala*, 931 F.3d at 898. And courts routinely strike down conditions on federal funding when the government flexes its power of the purse to restrict expression of disfavored views. *AID*, 570 U.S. at 214 (citing *Rust*, 500 U.S. at 197); *see e.g., Legal Servs. Corp v. Velazquez*, 531 U.S. 533, 547-49 (2001); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 542 (N.D. Cal. 2020).

### C.    Defendants retaliated against Plaintiffs' speech.

Finally, Defendants' termination of Plaintiffs' grants was an act of retaliation. To demonstrate retaliation in violation of the First Amendment a plaintiff must show that "(1) it engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—*i.e.*, that there was a nexus between the defendant's actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016).

Defendants' actions easily meet these elements. Plaintiffs' statements about diversity, whether explicitly DEI statements or simply the use of the words like "diverse," are speech protected by the First Amendment. *See Thakur II*, 148 F.4th at 1108. The termination of Plaintiffs' grants was driven by a "censorious purpose." *Koala*, 931 F.3d at 898. Defendants, after apparently coordinating with a favored media outlet to publicize ending grants awarded to organizations with perceived DEI values, expressly stated that Plaintiffs' DEI speech and viewpoints motivated their decision to terminate Plaintiffs' awards. *Supra* at 7-12; *cf. Ariz. Students' Ass'n*, 824 F.3d at 870 (noting that plaintiff "may rely on evidence of temporal proximity between the protected activity and alleged retaliatory conduct to demonstrate that the defendant's purported reasons for its conduct are pretextual or false"). And, finally, Defendants' actions have had and continue to have a chilling effect on the speech of current and future federal grantees. MKWC has already removed the land acknowledgment statement from their website and past newsletters referencing diversity in response to Defendants' retaliatory conduct. Harling ¶ 29. IAE has been forced to reconsider how it publicly expresses its mission and work, and fears that it will be unable to seek alternative funding from federal and non-federal sources because of Defendants' targeting of its statement on DEI. Kaye ¶¶ 42-44. IAE's board has even raised the prospect of removing the organization's DEIJ statement and policy from its website in response to the terminations. *Id.* ¶ 43. IBP is both concerned and confused about what language can be used in their future publications without jeopardizing their participation in federal grant programs given that mere references to the "diversity" of bird species or statements encouraging all applicants to apply to future job postings might trigger retaliation from the Administration. Siegel ¶ 31.

Moreover, the "very existence" of Plaintiffs' terminations and Defendants' rationale on X is almost certainly causing "others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *see also Newsom v. Albermarle Cnty. Sch. Bd*., 354 F.3d 249, 257 (4th Cir. 2003) ("[T]hose who desire to engage in legally protected expression . . . may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid") (cleaned up). This is especially true given the wide range of language that the government could perceive as supportive of DEI values, as the cancellation of IBP and MKWC's awards demonstrate. A facially overbroad prohibition punishes "a substantial amount of protected speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (cleaned up).

## II.    Plaintiffs are Suffering and Will Continue to Suffer Increasingly Irreparable Harm Absent Injunctive Relief

Plaintiffs' First Amendment injury alone is irreparable harm that warrants injunctive relief. The "deprivation of constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), particularly the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod* v. *Burns,* 427 U.S. 347, 373 (1976); *accord Klein* v. *City of San Clemente,* 584 F.3d 1196, 1207-08 (9th Cir. 2009); *Cuviello* v. *City of Vallejo,* 944 F.3d 816, 833 (9th Cir. 2019); *Rodriguez v. Robbins*, 715 F.3d 1127, 1144-45 (9th Cir. 2013). As detailed above, Defendants have infringed upon Plaintiffs' freedom of speech and expression. *Supra* at 12-13. Where, as here, governmental action causes constitutional injuries, injunctive relief is appropriate. *See Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017).

Compounding the loss of Plaintiffs' freedom of speech, Defendants' terminations have significantly impacted Plaintiffs' operations, workforce and the livelihood of their employees.

PAGE - 26    PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

IAE has already laid off almost half of its regular employees, Kaye ¶ 31, and dismissed reliable seasonal workers trained, educated and experienced in on-the-ground conservation. *Id.* ¶ 32. This loss puts even more strain on IAE's remaining staff and reduces productivity and morale. *Id.* ¶ 33.  IBP has been forced to cut staff members' hours for next year and has laid off one full-time scientist. Siegel ¶ 24. The loss of IBP's grant agreements has also left the organization unable to hire the skilled seasonal workers it relies upon. *Id.* ¶ 25. Like IAE, IBP's staff and employees are experts in their fields, have specialized educations and are not easily replaced; if this Court fails to grant Plaintiffs' relief, IBP will likely lose these employees to other opportunities. Siegel ¶¶ 24-25. Likewise, the unexpected grant terminations have put great strain on MKWC's staff, which had to work overtime during peak implementation season to mitigate impacts on staff to the greatest extent possible. Harling ¶ 27. This kind of loss of staff constitutes irreparable injury. *See Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 858-59 (D. Md. 2025) (agency action affecting existence of programs and livelihoods of individuals within those programs constituted irreparable harm). For IAE, federal funds account for the majority of IAE's operating budget. Kaye ¶ 30. Without relief, IAE's ability to continue the scope and depth of its work is severely diminished. *Id.* These costs, even if recoverable, "may constitute irreparable harm . . . where the loss threatens the very existence" of an organization or program. *Packard Elevator v. ICC*, 782 F. 2d 112, 115 (8th Cir. 1986).

Plaintiffs are also suffering reputational harm. "Injury to reputation 'is not easily measured or fully compensable in damage' and thus is 'often held to be irreparable.'" *Or. Council for Humans v. U.S. DOGE Serv.*, 794 F. Supp. 3d 840, 892 (D. Or. 2025) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 102 F.3d 12, 20 (1st Cir. 1996) (collecting cases discussing irreparable nature of reputational harms). Each Plaintiff has had longstanding

relationships with community partners across the American West that have been irreparably harmed by the grant terminations. Kaye ¶¶ 35–38, Siegel ¶ 26, Harling ¶ 25; *See also Maryland v. Corp. for Nat'l and Cmty. Serv.*, 785 F. Supp. 3d 68, 118 (D. Md. 2025) ("The abrupt exiting of members and erosion of trust built between service programs and the community will have a detrimental impact on these programs absent immediate injunctive relief."). For example, IAE regularly enters contracts with small farmers to grow native seeds. Kaye ¶ 35. By entering these contracts, these farmers agree to set aside acres of fields to grow native plants for restoration projects that otherwise lack economic return, with the understanding that they would be duly compensated by IAE through their grant funding. *Id.* Unfortunately, the grant terminations caused twenty-six contracts for farm production to be lost, and in some places the "seed is just sitting in a warehouse." *Id.* ¶¶ 35-36. As a result, IAE has now potentially lost trust with these farmers, and they may be reluctant to enter into agreements with IAE—or any other organizations perceived to be engaged in government-censured speech—in the future. *Id.* ¶ 37. *See also Thakur v. Trump*, 787 F. Supp. 3d 955, 996 (N.D. Cal. 2025) ("*Thakur III*") (finding that "layoffs of team members, interruption of graduate programs, and the potential complete loss of projects" would harm the plaintiffs' reputations, causing irreparable injury).

Additionally, Defendants' terminations have made it difficult for Plaintiffs to accomplish their missions. *Supra* at 13; Harling ¶ 22-27, Kaye ¶ 29-34, Siegel ¶22-26; *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (harm to organizational missions is sufficient to show a likelihood of irreparable harm); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (same). Any disruption to Plaintiffs' work necessarily harms the natural environment, habitats and wildlife Plaintiffs support. "[E]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least

of long duration, *i.e.,* irreparable." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) (quoting *Lands Council v. McNair*, 537 F.3d 981, 1004 (9th Cir. 2008) (en banc)). Several of the grants terminated by Defendants supported important work to protect endangered species. Kaye ¶ 41 (describing conservation work for Taylor's checkerspot butterfly); Siegel ¶ 22 (describing conservation work for the threatened Gunnison Sage-Grouse). Further grants supported forest restoration and fire management in some of the most fire-prone regions of the United States. Kaye ¶ 40 (describing a project to use sagebrush to restore forests after wildfires); Harling ¶ 22 (describing how fire and fuels treatments were not being implemented as a result of the terminations). Without injunctive relief, the natural resources Interior is bound to protect will suffer in the absence of Plaintiffs' work.

### IV. The Balance of the Equities and the Public Interest Weigh in Favor of an Injunction

The final *Winter* two factors, balance of the equities and public interest, weigh strongly in favor of granting Plaintiffs' request for preliminary injunction. These factors merge when the federal government is a party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). To balance the equities, the court considers "the relative harms to [the] applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers) (quoting *Rokster v. Goldberg*, 448 U.S. 1306, 1308 (1980) (Brennan, J., in chambers)). "But when a party has established likelihood of success on the merits of a constitutional claim—particularly one involving a fundamental right—the remaining *Winter* factors favor enjoining the likely unconstitutional law." *Junior Sports Mags. Inc. v. Bonta,* 80 F.4th 1109, 1120 (9th Cir. 2023).

At the heart of this case are Plaintiffs' First Amendment rights, and "it is always in the public interest to prevent the violation of a party's constitutional rights." *See Baird v. Bonta*, 81

F.4th 1036, 1042 (9th Cir. 2023) (internal quotation marks omitted). All Plaintiffs have been punished for their actual or perceived speech and have had extended conversations on ways to limit the full range of their First Amendment rights to avoid further grant terminations. Harling ¶ 29 (describing removal of land acknowledgment from website); Kaye ¶¶ 42-44 (describing extended discussions about how to talk about organization's mission); Siegel ¶ 31 (describing trepidation about using the word "diversity" to describe bird species). Moreover, as detailed above, the unlawful termination of grants will continue to cause Plaintiffs to lay off employees and withdraw funding for several community partners across the American West. Finally, as Plaintiffs organizations are hampered in their ability to pursue their missions of environmental conservation, harm to the public has followed. Because of the loss of funding, several plants and animals may reach one step closer to extinction. *Id.* ¶ 22 (describing conservation work for the Gunnison sage-grouse, the pinyon jay, and bank swallows); Kaye ¶¶ 7-9 (describing conservation work for the threatened Fender's blue butterfly and the endangered Taylor's checkerspot butterfly); Harling ¶ 23 (describing conservation efforts for the coho salmon).The conservation of the American landscape and wildlife is undoubtedly in the public interest. *Cottonwood Envt'l. L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1077 (9th Cir. 2015) (finding that the preservation of endangered species is of "incalculable" value to the public interest).

Conversely, Defendants cannot show that they would suffer harm as a result of the injunction. The federal government faces no "harm from an injunction that merely ends an unlawful practice." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez*, 715 F.3d at 1145). To the contrary, an injunction serves the interests of the general public where it ensures that federal agency actions comply with federal law and the Constitution. *Am. Ass'n of Univ. Professors*, 2025 WL 3187762, at *43 (citing *Newby*, 838 F.3d at 12). Because there is no harm to Defendants that counterweighs the harm to Plaintiffs and the public at large, the balance of the equities weighs sharply in favor of Plaintiffs.

PAGE - 30    PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND
SUPPORTING MEMORANDUM

**V. This Court Has Jurisdiction to Hear Plaintiffs' Claims and Authority to Order Requested Relief**

This Court has the equitable power to enjoin unlawful actions by executive officials. *See, e.g., Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320, 326-27 (2015). And where executive action causes constitutional injuries, as Defendants' actions do here, injunctive relief is appropriate. *See Washington v. Trump*, 847 F.3d at 1169. The Supreme Court's preliminary stay orders in *NIH v. American Public Health Ass'n*, 606 U.S. ----, 145 S. Ct. 2658 (2025) and *Department of Education v. California*, 604 U.S. 650 (2025) do not undermine this Court's jurisdiction.

The Supreme Court specifically noted that district courts have jurisdiction over Constitutional claims. *See NIH*, 145 S. Ct. at 2673 n.3. Although "[t]he Tucker Act confers subject matter jurisdiction to [the] Court [of Federal Claims] over money-mandating constitutional claims ... the Federal Circuit has expressly held the Court of Federal Claims lacks jurisdiction over claims arising under the First Amendment ... as they are not money-mandating." *Stephens v. United States,* 165 Fed. Cl. 341, 348 (2023). *See also Harvard,* 798 F. Supp. 3d at 104 ("…simply put, contract claims against the federal government must be brought in the Court of Federal Claims, but claims that do not sound in contract or seek contract-based relief stay in federal district court."). This principle is applicable here as Plaintiffs seek declaratory and injunctive relief that "among other things, mandates that Defendants comply with the First Amendment." *Id.* at 106. Even if granting Plaintiffs' relief "might result in money changing hands," district court jurisdiction is appropriate when "what is fundamentally at issue is a bedrock constitutional principle rather than the interpretation of contract terms." *Id.* at 108. Plaintiffs' claims rest in the Constitution, not their contractual agreements. And "Plaintiffs' request to effectively undo the grant terminations and return Plaintiffs to the status quo does not

seek performance of a contractual obligation." *Thakur II*, 148 F.4th at 1104; *cf. Pauma Band of Luiseno Mission Indians of Pauma & Yuima Rsrv. v. California*, 813 F.3d 1155, 1167 (9th Cir. 2015) (noting that "one cannot specifically perform something that is not a term in the contract").

The Northern District of California's September 22, 2025 decision in *Thakur I,* 2025 WL 2696424, is instructive here. *See also Thakur II*, 148 F.4th at 1107-09. Similar to Plaintiffs, in *Thakur*, university researchers brought action against the President and 16 federal agencies alleging that the mass termination of grants by form letter or pursuant to President's executive orders to terminate all equity-related projects violated the First Amendment (and other statutes). *Thakur I,* 2025 WL 2696424. The district court, granting the university researchers' motion for preliminary injunction, affirmed that such viewpoint discrimination likely violates the First Amendment and declined to adopt the government's position that the Supreme Court's reasoning in *NIH* requires all grant termination challenges to be heard as contract disputes in the Court of Federal Claims. *Id.* The *Thakur I* court specifically noted that *NIH* did not "consider First Amendment claims, which are well-established to be beyond the Court of Federal claims." *Id.* at *1. This holding is undisturbed by *Department of Education v. California*, 604 U.S. 650 (2025) which does not address district courts' jurisdiction over constitutional claims. *See Thakur II*, 148 F.4th at 1104.

**VI. This Court Should Not Require Bond**

"Rule 65(c) of the Federal Rules of Civil Procedure states that '[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.'" *Or. Council for Humans*, 794 F. Supp. 3d at 900 (quoting Fed. R. Civ. P. 65(c)). Federal courts, however, have "discretion as to the

amount of the security required, if any," *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir.

2009), and authority to "dispense with the security requirement" all together. *People of State of*

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985).

Because "this litigation is brought by nonprofit organizations to protect the public interest and

ensure compliance with federal law," *Cmty. Legal Servs. in E. Palo Alto v. HHS*, 780 F. Supp. 3d

897, 926 (N.D. Cal. 2025), this Court should not require Plaintiffs to post bond. *See also Nat'l*

*Ass'n of Diversity Officers in Higher Educ.*, 767 F. Supp. 3d at 291 (setting "nominal bond of

zero dollars" because the plaintiffs brought the case to protect their constitutional rights and a

bond would "essentially forestall [the plaintiffs'] access to judicial review").

**VII.    This Court Should Enjoin Defendants' Unlawful Terminations**

Based on the foregoing violations and harms, Plaintiffs respectfully request this Court enter a

preliminary injunction against all Defendants:

1.    Declaring Defendants' notices of termination that terminated grants previously

awarded to Plaintiffs as unlawful and violative of the First Amendment to the United States

Constitution.

2.    Enjoining, pending further order of the Court, Defendants, their agents, and anyone

acting at Defendants' direction from giving effect to the violative terminations; restoring such

previously awarded grant agreements; and requiring Defendants to provide no-cost extensions to

grantees for the time necessary to resume and complete interrupted work and return to the lawful

and orderly grant procedures they employed prior to September 23, 2025, with extensions for any

passed deadlines and the suspension of any close-out procedures initiated by the violative

terminations;

3.     Enjoining Defendants from refusing to grant, non-renewing, withholding, freezing, suspending, terminating, conditioning, or otherwise restricting use of federal funds to Plaintiffs, or threatening to do so, based on Plaintiffs' actual or perceived statements regarding DEI.

4.     Requiring Defendants to file, within one week of entry of this order and every month thereafter until resolution of the merits, a Status Report documenting the actions that they have taken to comply with the Court's order.

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion and issue a preliminary injunction consistent with Plaintiffs' requested relief.

Dated: December 23, 2025                              Respectfully submitted,

/s/ *Cortney Robinson Henderson*

Anna Sortun,
OSB No. 045279
Direct: 503-802-2107
Email: anna.sortun@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile: 503-274-8779

Cortney Robinson Henderson (*pro hac vice*)
Pablo A. Moraga*
Steven Y. Bressler *(pro hac vice)*
Robin Thurston*
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
Main: 202-448-9090
crhenderson@democracyforward.org

*Attorneys for Plaintiffs*
* Pro Hac Vice Forthcoming or Pending