IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

INSTITUTE FOR APPLIED ECOLOGY,
INSTITUTE FOR BIRD POPULATIONS,
MID KLAMATH WATERSHED
COUNCIL,

                Plaintiffs,

        vs.

DOUG BURGUM, in his official capacity
as Secretary of the United States Department
of the Interior, UNITED STATES
DEPARTMENT OF THE INTERIOR,
BUREAU OF LAND MANAGEMENT,
NATIONAL PARK SERVICE, UNITED
STATES FISH AND WILDLIFE SERVICE,
UNITED STATES GEOLOGICAL
SURVEY,

                Defendants.

_____

Case No. 6:25-cv-02364-MC

OPINION and ORDER

MCSHANE, J.:

        Plaintiffs Institute for Applied Ecology ("IAE"), Institute for Bird Populations ("IBP"), and

Mid Klamath Watershed Council ("MKWC") move for injunctive relief alleging that Defendants

violated Plaintiffs' First Amendment rights. Defendants Doug Burgum, U.S. Department of the

Interior, Bureau of Land Management, National Park Service, U.S. Fish and Wildlife Service, and

U.S. Geological Survey argue that this Court lacks jurisdiction over Plaintiffs' claims and, in the alternative, that Plaintiffs' fail to establish any First Amendment violations. Because Plaintiffs have established a strong likelihood of success on the merits and have demonstrated that the balance of equities tilts sharply in their favor, Plaintiffs' Motion for Preliminary Injunction, ECF No. 17, is GRANTED.

## FACTUAL BACKGROUND

Plaintiffs are non-profit organizations focused on environmental conservation work in the Western United States. Compl. ¶ 2, ECF No. 1. Plaintiffs each have a history of receiving grants for conservation-related activities from agencies associated with the Department of Interior. Compl. ¶¶ 22-29. In 2025, Plaintiffs each received awards for further funding: IAE received three award modifications in August, MKWC received a modification in early September, and IBP received a grant modification on September 21. Compl. ¶¶ 23, 26, 29; Siegel Decl. Ex. 2, at 40, ECF No. 20-2.

On September 23, 2025, Defendants terminated Plaintiffs' grants. The termination notices stated that the grants "no longer effectuate[d agency] priorities" pursuant to 2 C.F.R. § 200.340. Compl. ¶ 31. Subsequently, Defendants informed Plaintiffs that the terminations did not result from non-compliance with award terms. Kaye Decl. Ex. 5, at 2, ECF No. 19-5; Siegel Decl. Ex. 4, at 2; Harling Decl. Ex. 6, at 2, ECF No. 21-6.

That same day, each Plaintiff received an email from Audrey Streb at the Daily Caller requesting comment on the organization's values and their commitment to "diversity, equity, and inclusion" ("DEI"). Kaye Decl. Ex. 3, at 2; Siegel Decl. Ex. 6, at 2; Harling Decl. Ex. 4, at 2. That afternoon, the Daily Caller published an article titled "EXCLUSIVE: Trump Admin Axes Millions In Grants To Several DEI-Tied Environmental Organizations[.]" Pls.' Mot. Ex. 1, at 1, ECF

17-1. The article specifically mentioned IAE, IBP, and MKWC, and quoted DEI materials from IAE's website. *Id.* at 2.

Later that afternoon, Secretary Burgum posted on X: "Because of @DOGE's cost-cutting initiative, @Interior saved American taxpayers MILLIONS of dollars today by cutting nearly 80 grants for wasteful environmental groups. Real action = real savings[.]" Kaye Decl. ¶ 25. Secretary Burgum included a link to the Daily Caller article in his post. *Id.* The following day, the Department of Government Efficiency reposted Secretary Burgum's post and stated:

> Great working with @SecretaryBurgum and the @Interior team in terminating 79 wasteful grants with savings of $14M. The grant recipient NGOs were not aligned with agency priorities, using taxpayer dollars for "recruiting, hiring, training and investing in staff and the organization to increase engagement, diversity, accessibility and inclusivity across communities we live and work" and asserting that "we are passionate about inclusion across gender, race, age, religion, identity and experience".

*Id.* The repost quoted DEI materials from IAE's website. Kaye Decl. Ex. 7, at 2; Kaye Decl. Ex. 8, at 2.

Each Plaintiff had statements or material related to diversity on its website. IAE's website included materials expressly related to DEI: a diversity statement and a "Diversity, Equity, Inclusion & Justice Action Plan." *Id.* IAE attests that these materials were funded by grants from a private philanthropic foundation and no direct federal funding supported them. Kaye Decl. ¶ 27.

Although IBP's website did not mention DEI, it contained references to "diversity" amongst bird species. Siegel Decl. ¶ 19. IBP's website also contained job postings stating that "IBP values diversity and encourages people from all backgrounds to apply." *Id.* ¶ 20. Like IAE, IBP attests that it has not used federal funding to support DEI work. *Id.* ¶ 21.

MKWC's website included a statement that the organization's work "takes place on the ancestral lands of [indigenous groups]." Harling Decl. Ex. 7, at 2, ECF No. 21-7. MKWC attests that it has not used direct federal funding to support DEI work. Harling Decl. ¶ 21, ECF No. 21.

**STANDARDS**

A plaintiff seeking a preliminary injunction must establish: (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When, as here, the government is a party, the last two factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). When there are "serious questions going to the merits," a court may still issue a preliminary injunction when "the balance of hardships tips sharply in the plaintiff's favor," and the other two factors are met. *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). The court's decision on a motion for a preliminary injunction is not a ruling on the merits. *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

**DISCUSSION**

Defendants first argue that because Plaintiffs' claims seek to challenge the termination of government contracts, this Court lacks jurisdiction over Plaintiffs' claims. Defendants next argue that even assuming that this Court has jurisdiction to resolve Plaintiffs' claims, Plaintiffs' fail to establish any first amendment violations. Finally, Defendants argue that even assuming that Plaintiffs are likely to succeed on the merits, they have not demonstrated that they are entitled to injunctive relief. This Court disagrees.

**I.     Plaintiffs' Claims Are Not Barred by the Tucker Act**

The Tucker Act "confers exclusive jurisdiction [over contract claims against the United States] on the Court of Federal Claims." *Thakur v. Trump*, 163 F.4th 1198, 1204 (9th Cir. 2025); 28 U.S.C. § 1491(a)(1). Contract claims are those "concerned solely with rights created within the

contractual relationship [that have] nothing to do with duties arising independently of the contract." *N. Star Alaska v. United States*, 14 F.3d 36 (9th Cir. 1994). Contract claims are distinguishable from statutory or constitutional claims which merely lead to "an order setting aside an agency's action [and resulting] in the disbursement of funds." *See Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025). District courts, not the Court of Federal Claims, have jurisdiction over such "statutorily or constitutionally based" claims. *Thakur*, 163 F.4th at 1204.

Contract claims that are "disguised" as statutory or constitutional claims remain within the jurisdiction of the Court of Federal Claims. *Id.* For example, claims brought under the Administrative Procedure Act challenging an agency's allegedly "arbitrary and capricious" termination of government contracts are merely contract claims disguised as APA claims. *See California*, 604 U.S. 650 (2025); *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 606 U.S. ---, 145 S. Ct. 2658, 2661 (2025). Therefore, District Courts lack jurisdiction over the claims. *Id.* To determine whether a claim is merely "a disguised breach of contract claim," the Court applies the *Megapulse* test. *Thakur*, 163 F.4th at 1204. The *Megapulse* test inquires as to (1) the source of the rights underlying the claims and (2) the type of relief sought. *Id.*

Here, Plaintiffs' claims are not contract claims—disguised or otherwise. First, the source of the rights underlying Plaintiffs' claims relates to "duties arising independently of the contract," namely, the constitutional obligations of the government to its citizens under the First Amendment. The First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const., Amdt. 1. Here, because Plaintiffs seek to prevent the government from dictating what Plaintiffs' may display on their websites, Plaintiffs seek to prevent the government from "abridging [their] freedom of speech." While Plaintiffs' claims are inherently related to the termination of

their grant funding, the mechanism by which Defendants allegedly abridged Plaintiffs' rights is of secondary importance to the alleged violations from which the claims stem.

Second, the relief sought by Plaintiffs is ultimately the freedom to exercise their First Amendment rights outside of their federally funded projects, not necessarily the continued funding of those projects or some form of compensatory relief. For example, Plaintiffs do not simply request an injunction because they think they are entitled to the grants; rather, Plaintiffs seek an injunction specifically where grant terminations were "based on Plaintiffs' actual or perceived statements regarding DEI." Pls.' Mot. 41, ECF No. 17. While Plaintiffs' claims could result in the disbursement of federal funds, the monetary relief is secondary to the relief sought in alleviating the chilling effect on Plaintiffs' free speech.

*Am. Acad. Of Pediatrics v. United States HHS*, No. 25-cv-4505, 2026 WL 80796 (D.D.C. Jan. 11, 2026), decided less-than two months ago, is instructive. There, a professional organization of pediatricians alleged that the Department of Health and Human Services terminated grants not based on any legitimate policy decisions, but rather to silence the pediatricians' speech on vaccinations (which contrasted with the views of newly instituted HHS leadership). *Id*. at *2. As is the case here, Plaintiffs there brought First Amendment claims and, as here, Defendant argued such claims were disguised contract claims over which the district court lacked jurisdiction.

The district court first noted that the *Megapulse* court "rejected the position 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act." *Id*. at *10 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982)). The court then applied the *Megapulse* test—i.e., it looked not only at the source of the right to relief but on the type of relief sought—in ultimately classifying the

claim "as one which is or is not 'at its essence' a contract action." *Id.* (quoting *Megapulse*, 672 F.2d at 968).

The court noted the source of the pediatrists' First Amendment claims were not contractual because (1) the claims arose from the Constitution and (2) "those rights exist completely separately from any terms created under the grant award agreements." *Id.* at *11. That the claims happened to involve government contracts was immaterial because "the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." *Id.* (quoting *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, (D.C. Cir. 2022).

Turning to the type of relief sought, the court distinguished between typical "monetary damages" and equitable relief (even when such relief may include financial compensation.) *Id.* The court noted "that money damages 'refers to a sum of money used as compensatory relief." Specific remedies in the form of equitable relief 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'" *Id.* (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988) (internal citations omitted). Although the pediatricians sought an injunction that would restore the previously terminated grants, that remedy was to return the parties to the status quo (and not to compensate for the terminated grant). *Id.* Such relief was equitable relief, not money damages on a breach of contract claim. *Id.* The same analysis applies to the claims and relief sought here.

Because the source of the rights underlying Plaintiffs' claims is the United States Constitution and the relief sought is equitable relief to restore the status quo, Plaintiffs' claims are not contract claims—disguised or otherwise—and this Court has jurisdiction.

II.    <u>**Likelihood of Success on the Merits**</u>

Plaintiffs are likely to succeed on the merits of their First Amendment claims. The First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const., Amdt. 1. That clause means the government "may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995). Regulation based on subject matter is "content discrimination." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Regulation based on the "motivating ideology[,] opinion[,] or perspective of the speaker" is "viewpoint discrimination." *Rosenberger*, 515 U.S. at 828. Viewpoint discrimination is an "egregious form" and subset of content discrimination. *Id.*

The permissibility of regulating speech comes front and center when the federal government distributes money. Under the Spending Clause, Congress has wide latitude to fund some activities and refrain from funding others. *See Regan v. Tax'n With Representation of Washington*, 461 U.S. 540, 546 (1983). Such selective funding is not viewpoint discrimination; it is merely a choice "to fund one activity to the exclusion of the other." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). In awarding funding, Congress is free to impose constraints to ensure that monies are spent as intended. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013). Such constraints remain permissible even if their acceptance would limit the grantee's First Amendment rights. *Id.* at 214; *see Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88 (1998) ("[T]he Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake.").

The Supreme Court has held, however, that constraints are impermissible where they limit speech *beyond* the scope of ensuring monies are spent as intended. *Agency for Int'l Dev.*, 570 U.S. at 214-15; *see also Nat'l Endowment for the Arts*, 524 U.S. at 587 ("We have stated that, even in

the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas[.]'") (*quoting Regan*, 461 U.S. at 550). In the words of the Ninth Circuit, the Supreme Court has repeatedly warned that "the First Amendment will not tolerate the administration of subsidy programs with a censorious purpose." *Koala v. Khosla*, 931 F.3d 887, 898 (9th Cir. 2019).

The Ninth Circuit applied this distinction in *Youth71Five Ministries v. Williams*, 160 F.4th 964 (9th Cir. 2025). There, a Christian youth organization alleged a violation of its First Amendment rights in relation to an Oregon Department of Education rule. *Id.* at 974-75. The Organization received Department funds for a subset of its programs. *Id.* at 988. The Organization also required its staff to agree to a "Christian Statement of Faith" and be involved in a church. *Id.* at 975. The Department rule required that grant applicants certify that they do not discriminate on the basis of religion. *Id.* The Ninth Circuit held that while the rule was a permissible constraint on programs receiving Department funding, the rule was likely unconstitutional to the extent that it "leveraged funding" to constrain the Organization's rights "outside the contours" of those programs. *Id.* at 988; *see also Thakur v. Trump*, 163 F.4th 1198, 1206 (9th Cir. 2025).

Here, Plaintiffs are likely to succeed on the merits because this case is much like *Youth71Five Ministries*. In both cases, entities funded a subset of their programs through government awards. Kaye Decl. ¶ 6; Siegel Decl. ¶ 7; Harling Decl. ¶ 5. In both cases, those entities sought to or exercised their First Amendment rights. In both cases, the government's funding constraints limited the entities' exercise of their rights outside the contours of the programs for which the government awarded the funding. Because the Oregon Department of Education's rule was likely unconstitutional where it leveraged funding to regulate the Organization's conduct outside of the contours of Department-funded programs, Interior's revocation of grants is likely unconstitutional where it leverages funding to regulate Plaintiffs' conduct outside of the contours

of Interior-funded programs.

The Court notes that at this stage, Defendants' argument that they terminated the programs for cost-cutting reasons absent any DEI factors falls apart when compared to the admissible evidence in the record. As demonstrated above, all three Plaintiffs received grant award modifications within one month of having their grants abruptly terminated. The same day Defendants terminated the grants, Daily Caller published an article naming each Plaintiff with a headline stating Plaintiffs' grants were terminated because of Plaintiff's DEI statements. Although Defendants attempt to distance themselves from the article, Secretary Burgum and DOGE posted statements on X specifically referencing (1) the terminations of the grants (2) DEI statements of the organizations and (3) the Daily Caller article. This is more than enough contemporaneous circumstantial evidence providing plausibility to Plaintiffs' First Amendment claims.

Additionally, Plaintiffs provide additional evidence indicating Defendants' proffered reason for the terminations—cutting costs—is a sham. Will Harling, Restoration Director for MKWC, provided a supplemental declaration stating that on January 12, 2026, MCKW received an award for a grant with a scope of work that "is materially identical to that of the" grant terminated on September 23, 2025. Harling Supp. Dec. ¶ 9.

Despite having over 10 weeks to submit evidence supporting their argument that Defendants terminated Plaintiffs' grants for legitimate reasons, Defendants have, rather remarkably, managed to introduce practically nothing to support their argument that cost cutting, and not speech, drove the terminations. In fact, Defendants only submit four declarations that, with the exception that the declarations come from individuals employed in different agencies, are identical. Lewandowski Decl., ECF No. 26; Sage Decl., ECF No. 27; Hutchinson Decl., ECF No. 28; Oyster Decl., ECF No. 29. Each declaration contains an identical final paragraph attempting

to justify the terminations:

> From my perspective, based on information that I have received and to the best of
> my knowledge, the terminations at issue in this case were based on the justification
> asserted in the individual termination notices—a change in agency priorities.

*Id.* ¶¶ 7.

The Court agrees with Defendants that the terminations appear to be based on "a change in agency priorities." However, based on this record—which Defendants have had over 10 weeks to supplement or rebut—it appears that the policy change was based on a decision to punish any organization with any connection to DEI speech.

## III.     <u>The Remaining Preliminary Injunction Factors Favor Plaintiffs</u>

From the outset, the likelihood of irreparable harm favors Plaintiffs because Plaintiffs allege constraints to their First Amendment freedoms. In First Amendment cases, establishing irreparable harm is straightforward because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting Elrod v. Burns 427 U.S. 347, 373 (1976)); *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694 (9th Cir. 2023). The existence of a "colorable" First Amendment claim is sufficient to establish irreparable harm. *Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014); *Fellowship of Christian Athletes*, 82 F.4th at 694-95. Here, because Plaintiffs are likely to succeed on the merits, Plaintiffs establish a "colorable" First Amendment claim and, thus, the likelihood of irreparable harm from the outset.

But Plaintiffs show more. In addition to their "colorable" First Amendment claim, Plaintiffs allege extensive cascading effects of an irreparable nature. Those effects include layoffs of highly skilled employees, damaged professional relationships and reputations, potential loss of key perishable materials, and impacts to financial stability generally. *See* Kaye Decl. ¶¶ 29-41, ECF No. 19; Siegel Decl. ¶¶ 22-26, ECF No. 20; Harling Decl. ¶¶ 22-27, ECF No. 21.

Importantly, while Plaintiffs establish the likelihood of irreparable harm, the Court must be careful to avoid thoughtlessly dismissing potential harm to Defendants. Recently, the Supreme Court emphasized the irreparable nature of harm stemming from the disbursement of federal funds that may ultimately prove unrecoverable upon a defendant's success. *See Dep't of Educ. v. California*, 604 U.S. 650, 651-52 (2025). Because the Court here declines to impose bond, Defendants admittedly run the risk of suffering such harm.[1]

However, the Court concludes that the likelihood of irreparable harm favors Plaintiffs because (1) Defendants have presented no countervailing evidence and (2) the conclusion is consistent with the reasoning in *Department of Education*.

First, Defendants have failed to provide this Court with evidence of their eventual success and consequent need to collect disbursed funds. As discussed, Defendants have submitted no compelling evidence to support their position that these cuts were anything other than retaliatory. Plaintiffs, on the other hand, have submitted seven declarations and 25 accompanying exhibits. *See* Kaye Decls., ECF Nos. 19, 35; Siegel Decls., ECF Nos. 20, 37; Harling Decls., ECF Nos. 21, 36. On this record, Plaintiffs have persuasively established that Defendants intentionally set out to punish Plaintiffs for their speech (or perceived speech).

Second, concluding that Plaintiffs' risk of irreparable harm outweighs that of Defendants is consistent with the reasoning in *Department of Education*. There, the Supreme Court rested its

---

[1] Despite the seeming mandate of Fed. R. Civ. P. 65(c), district courts have discretion to set the amount of security they see fit. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009); *see also Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). That amount may be zero where "there is no realistic likelihood of harm to the defendant." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Here, the Court declines to impose bond because, as discussed in relation to irreparable harm, Defendants have failed to submit any evidence to rebut Plaintiffs' claims and show a "realistic likelihood of harm." This is particularly relevant here due to the conspicuous lack of evidence Defendants submitted to bolster their arguments on the merits. Additionally, Plaintiffs' lack the financial resources to post any significant security. Because requiring a bond in this instance "would effectively deny access to judicial review," the Court waives security. *People State Cal. ex rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985).

analysis, in part, on the fact that the plaintiffs had the financial resources to keep their programs running. *Dep't of Educ.*, 604 U.S. at 652. Here, the evidence in the record shows that the grant terminations have already significantly impacted Plaintiffs' operations and caused irreparable harm. Defendants have submitted no evidence to rebut Plaintiffs' assertions.

Additionally, Plaintiffs have established that the balance of equities tips in their favor and that an injunction is in the public interest. Similar to the likelihood of irreparable harm analysis, raising "serious First Amendment questions" alone tips the balance of the equities "sharply" in favor of the plaintiff. *Fellowship of Christian Athletes*, 82 F.4th at 695; *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019). Moreover, preventing the violation of a party's constitutional rights "is always in the public interest." *Am. Beverage Ass'n*, 916 F.3d at 758; *see also Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014). Because Plaintiffs are likely to succeed on the merits, Plaintiffs at least raise "serious First Amendment questions," and this factor, too, weighs in favor of Plaintiffs.

## <u>CONCLUSION</u>

Plaintiffs' Motion for a Preliminary Injunction, ECF No. 17, is GRANTED. Defendants ask that, in the event the Court issues injunctive relief, the Court should stay the injunction for seven days to allow Defendants to seek an emergency stay of the injunction. Defs.' Resp. 19, ECF No. 25. The Court agrees that a seven-day stay is warranted here.

Absent a stay from the Ninth Circuit or the Supreme Court, this injunction goes into effect seven days from the date this opinion is docketed. At that time, Defendants are enjoined from giving effect to the September 2025 termination letters at issue here and shall restore Plaintiffs' previously awarded grant agreements with no-cost extensions to Plaintiffs for the time necessary

to resume and complete interrupted work. Additionally, Defendants shall provide extensions for any passed deadlines and suspend any close-out procedures initiated by the termination letters.

IT IS SO ORDERED.

DATED this 12th day of March 2026.

_____/s/ Michael McShane_____
Michael McShane
United States District Judge